LATONIA SMITH
9748 CANYON LANDING AVE.
LAS VEGAS, NV 89166
725-203-2455
PLAINTIFF IN PROPER PERSON

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

LATONIA SMITH,

        Plaintiff(s),

-vs-

FENNEMORE CRAIG,

        Defendant(s).

CASE NO. 2:19-cv-00824-GMN-EJY

## OPPOSITION TO DEFENDANTS MOTION, CROSS MOTION TO SEAL MEDICAL RECORDS AND ISSUE A PERMANENT PROTECTIVE ORDER AND PERMANENT INJUNCTIVE RELIEF REGARDING PLAINTIFF'S MEDICAL RECORDS

### INTRODUCTION

Plaintiff Latonia Smith files her opposition to defendant's "emergency" motion. The opposition is based on memorandum of points and authorities, the attached Exhibits, the papers and pleadings on file with the Court, and such other written or oral argument that the Court may allow.

### MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiff Latonia Smith is infuriated by defendant's latest attempts to use Plaintiff's medical records, now, as a means to subvert the discovery process. Ms. Smith did not file any medical records or authorize the filing of any public medical records and all of Ms. Smith's medical records have been sealed and prohibited from distribution and were sealed and/or placed under confidentiality until their sealing before this litigation began. Still, Fennemore Craig found it amusing to once again publicly file Plaintiff's medical records and then, again, use them herein for the most absurd arguments, asserting that the Plaintiff should be prevented from conducting discovery. Truly, these are the most despicable, hateful,

1

and low-life actions that these attorneys, who have no moral or ethical compass, can engage in. These attorneys are the textbook example of opponents to mental health, they are a part of the problem, and they are just one pitiful example of the reason many people do not seek mental health treatment; progress is halted because of people like them and it is beyond disgusting that this even has to be addressed as grossly improper in the 21st century. This Court should not continue to allow this lambasting of the Plaintiff and should not allow bottom-feeder attorneys, like those at Fennemore Craig, to use Plaintiff's medical records to draw whatever speculations they so choose to fit their fairy-tale lies. Without discussing much of the details of such records herein, the Plaintiff moves this Court to exclude Ms. Smith's medical records from all proceedings, to issue a permanent protective order over such records, and to issue permanent injunctive relief preventing Fennemore, CEC/PHWLV, or any of their associates (even those just merely connected to them in any way) from using and/or distributing Ms. Smith's medical records and/or instructing other non-parties to use/distribute Ms. Smith's medical records. In addition, Fennemore's arguments concerning Ms. Smith's medical records fail for several reasons. Namely, (1) Ms. Smith did not ever give any statements concerning the *causes* that led to her hospitalization nor any details concerning any ideations to any hospital medical professionals; (2) there are several conflicting notes due to the fact that these hospital medical professionals created their own storyline surrounding Ms. Smith's reasons for being hospitalized after Ms. Smith would not communicate the causes (all of which were inaccurate); (3) there is even another note that reads that Ms. Smith never stated to hospital personnel what caused her to be hospitalized further supporting fact (1) and (2); (4) Ms. Smith never had a job during the time period in which defendants are arguing and attempting to use the erroneous medical notes (can further be overwhelmingly proven) and Ms. Smith has never sent emails, nor has she ever stated that she sent emails, to such a non-existent job. Fennemore's attempts to use these conflicting notes, which contain factual contentions, including the assertion by Ms. Smith that many of the "notes" are not based in any facts, to attempt to create a link to their lies that Ms. Smith sent them threatening letters—the same argument that their co-conspirators have continually used since 2017 which caused Ms. Smith to be hospitalized in the first place--which, in fact, they, themselves created, is equally absurd. In addition to containing conflicting and false statements, such records contain Ms. Smith's medical record number, social security, and other private information. Further, there is no cognizable reason for Fennemore Craig's use of such records in this litigation, which clearly violate HIPAA.

  Fennemore's argument that the motion should be heard on an emergency basis because Ms. Smith issued subpoenas for depositions as early as August 20, 2019 is ridiculous; they are only using this

motion under the guise of an "emergency" to further annoy and take digs at the Plaintiff, and their motion is considerably vexatious. If anything, Fennemore should be sanctioned on an emergency basis under FRCP 37(f) and Ms. Smith does not even argue for such sanctions. Fennemore already asserted, on August 12, 2019, that they would directly disobey the order of Judge Foley and stay discovery on their own. In fact, in the August 12, 2019 correspondence to Ms. Smith's personal email (which is a separate issue) defendant stated:

> **"To be clear, absent a court order, the Fennemore Employees will not appear for the noticed depositions, forensic examinations, or document productions at the dates and time referenced in your Subpoenas, and Fennemore will not grant access for the proposed office inspections. We therefore suggest that you take whatever steps are necessary to reduce the expense you may incur by having reserved those dates."**

Ms. Smith already set out to cancel all discovery scheduled for defendants since they boldly asserted that they would not comply with any subpoenas absent a court order. As such, the witness fees that were being sent for Ms. Braselton were also halted until resolution of this issue.

Ms. Smith already laid out her argument and attached an affidavit regarding Fennemore's refusal to meet and confer despite Ms. Smith's willingness to do so, in her Motion to Compel. A meet and confer is between the parties and there are no civil procedures that requires a non-party, particularly one in a completely separate case, to be in attendance at a meet and confer (**FRCP 26**).

### DEFENDANT'S INTRODUCTION

Ms. Smith did not agree to a stay of discovery concerning the factual contentions of defendant's motions, and, in fact, the issue became moot when Judge Foley ordered discovery to begin. All of Ms. Smith's subpoenas were tailored to specific information, which is absolutely central to this case and none of Ms. Smith's subpoenas are improper, nor can Fennemore hide behind their excuses of confidentiality, privilege, and work product to bar Ms. Smith from access to the central evidence in this case. In fact, Ms. Smith's willingness to meet and confer with Alex Fugazzi regarding the forensic examinations was to further clarify the parameters already set out by Ms. Smith in the subpoenas. Ms. Smith was also going to address Fugazzi's argument that depositions should not be conducted, and documents should not be handed over, which is a direct violation of FRCP 26(b). Ms. Smith has a right to take the depositions of any witness in this case and she has a right to gather the evidence central to the case.

Further, Fennemore's continued allegations that Ms. Smith has a history of threats and harassing behavior are completely unfounded, and just another one of the many "excuses" that they are trying to

hide behind in order to prevent the truth of these matters from being uncovered. Indeed, Fennemore will pose great oppositions to dispelling evidence, such as asking this Court to impose restrictions on Ms. Smith's deposition of key witnesses, because they have to hide their own despicable, criminal behavior and that of their cohorts.

**DEFENDANT'S FACTUAL BACKGROUND**

**A.**

Ms. Smith properly issued subpoenas after Judge Foley ordered that discovery should not be stayed and should begin. Judge Foley's orders did not include anything about initial disclosures and both parties actually did agree to a stay of initial disclosures. Ms. Smith has honored that agreement, which also precluded Ms. Smith from issuing discovery requests under FRCP 34. Ms. Smith's subpoenas only seek access to Fennemore's offices for the purposes of the forensic examinations of the computers directed towards the individuals listed in the subpoenas. Ms. Smith is entitled to conduct depositions of the witnesses central to the case (it seems as if Mr. Fugazzi is arguing that Ms. Smith should not be allowed to conduct depositions which is unheard of). Mr. Fugazzi attempts to argue that Ms. Smith issued subpoenas seeking unfettered access to forensically examine devices. Ms. Smith actually set out the parameters by which the search would be conducted and was willing to meet and confer about such parameters. Ms. Smith did, in fact, set out that intended discussion, which defense refused to attend, in her Motion to Compel. Fennemore's own insertion of the Plaintiff's request illustrate that the subpoena requests were tailored not only to specific conversations and subject matters, but to a very specific time frame. Considering the matters at issue in this case, Ms. Smith's requests are proper. Ms. Smith will not address Mr. Fugazzi's claims about the meet and confer again; defense refused to meet and confer without his non-party friend whose attendance was not required. All of Fennemore's "reasons" for the need for an emergency motion only illustrate their ulterior motive to stop Ms. Smith from gathering relevant and time-sensitive evidence; their excuses hardly illustrate a need for an "emergency" as opposed to their goal to cause vexation and undue prejudice.

**B.**

In 2017, PHWLV and CEC engaged in a conspiracy to fire Mrs. Peruzar after they falsified documents and began slandering Mrs. Peruzar in order to frame Mrs. Peruzar for a theft that was committed by another employee that they wanted to protect. Since then it has been overwhelmingly revealed that Mrs. Peruzar was in fact framed, even with the victim in question in the case signing an affidavit and making statements that the event occurred on a day in which Mrs. Peruzar was on a different

4

floor. Since the story of PHWLV and CEC seemed unlikely and they were not assured that Mrs. Peruzar would be fired, CEC/PHWLV along with their cohorts began creating messages and asserting that these messages came from Ms. Smith, who they had researched before-hand. After terminating Mrs. Peruzar, CEC/PHWLV along with their cohorts continued these defamatory accusations causing Ms. Smith to be hospitalized. One of the first third parties they contacted, spreading these defamatory accusations, was the third-party witness Teri Pringle (**Exhibit A**) even go so far as to call her on Christmas day and telling this person that Plaintiff's *name* was on these threats; this witness has never met Ms. Smith, nor did she know Ms. Smith. CEC/PHWLV and their cohorts continued their defamatory accusations even after being warned to cease their actions. Ms. Smith also reached out to the CEO to quell the issues, without realizing at the time that this was all a part of a larger, nefarious plan. Several months later (and because Mrs. Peruzar was still in a position to be re-employed) CEC/PHWLV and their cohorts randomly began filing protective orders against Ms. Smith and added Ms. Smith to a lawsuit containing 50 DOE parties as retaliation. The matters were disposed by admission of CEC/PHWLV themselves that they had no evidence pointing to Ms. Smith. In fact, all they used in their attempts to target Ms. Smith were the fabricated messages that they continually insert into every matter and which is at subject in this lawsuit after they were created by CEC/PHWLV, Fennemore Craig, and their associates.

Mrs. Peruzar filed a lawsuit against CEC/PHWLV in November of 2018 based on the matters concerning their falsification of evidence and defamation. Namely, a wrongful termination suit. When Mrs. Peruzar filed the lawsuit, CEC/PHWLV and their cohorts continued their hateful and malicious targeting of Ms. Smith, seeking to resurrect their failed 2017 plot.

Defense's false assertions that Ms. Smith sent threats to previously unknown third party, Ms. Radak, is completely unfounded and not based in any fact.

Defense's false assertions that Ms. Smith threated Shannon Pierce and previously unknown third party, Ethan Thomas, is completely unfounded and not based in any fact.

Defense's false assertions that previously unknown third parties Shawna Braselton and Wade Beavers were threatened by Ms. Smith is equally, completely unfounded and not based in any fact.

What is evident is the pattern that the only people that have targeted Ms. Smith stem from the same two (2) corporations that were involved in terminating Mrs. Peruzar and ensuring Mrs. Peruzar would not be reinstated, and that the veracity of their wild accusations are all exactly the same—criminal and defamatory in nature, and based in messages that they created themselves; it is time to put an end to it. Ms. Smith has no history of any such actions nor does she have a history of any such accusations from

any other person/s outside of these two corporations, and those who know Ms. Smith and come forward to testify on her behalf will make it clear that this was an intricate attempt to harm Ms. Smith as a means of retaliating against a former employee all isolated inside of two (2) corporations that are willing to go to any means necessary to inflict damage on those who oppose them.

**DEFENDANT'S LEGAL ARGUMENT**

A.

Ms. Smith asks that the Court also hear her Motion to Compel in connection with the subject matters of defendant's instant emergency motion and incorporates all arguments contained in the Motion to Compel herein. Defendant's assertion that Ms. Smith has issued eighteen subpoenas is a little misleading. Ms. Smith has only subpoenaed eleven (11) individuals, with seven (7) of them being related to defendant. It is no surprise that Fennemore will try to hide behind broad claims of privilege to avoid handing over evidence that implicate themselves in fraudulent and criminal activity. Although Ms. Smith argues that the evidence being sought is not privileged at all and is subject to discovery given the facts of this case, defendant has asserted these broad claims before even making a diligent search for responsive documents illustrating their goal to hide behind a wall of "privacy" and "privilege" in not producing any evidence. "The party seeking to quash a subpoena bears a heavy burden of proof... "*Irons v. Karceski*, 74 F.3d 1262, 1264 (D.C. Cir. 1995); see *Diamond State Ins. Corp v. Rebel Oil co.*, 157 F.R.D. 691, 698-700 (D. Nev. 1994) (placing burden on movant under Rule 45(c)(3)(A)(iv)). The "overall purpose of discovery under the Federal Rules is to require the disclosure of all relevant information, so that the ultimate resolution of disputed issues in any civil action may be based on a full and accurate understanding of the true facts, and therefore embody a fair and just result." *State Nat'l Ins. Co. v. City of Destin*, 2015 WL 11109379, at *1 (N.D. Fla. Sept. 1, 2015).

As an overarching premise, Ms. Smith asserts a crime-fraud exception to all of defendant's claims and reasonings for not having to hand over evidence. There is no privilege where a client and lawyer consult or uses materials for the purpose of committing a crime or furthering a fraud. *United States v. Zolin*, 491 U.S. 554, 563 (1989). It is not necessary to show that the crime or fraud was actually completed—only that the crime or fraud was the objective of the communication. In *re Grand Jury Subpoena Duces Tecum*, 731 F.2d at 1039; Ms. Smith has already presented evidence of such. The Eleventh Circuit has held that the exception also applies to attorney-work product when attorneys were also involved. *Drummond Co. v. Conrad & Scherer, LLP*, Nos. 16-11090 & 15-90031 (11th Cir. March 23, 2018). The Ninth Circuit employs a preponderance of the evidence standard. In *re Napster, Inc.*

6

*Copyright Litig.,* **479 F.3d 1078, 1094-95 (9th Cir. 2007).** Ms. Smith does not waive this argument by asserting other arguments herein below.

B.

### Privilege

The scope of relevant discovery under FRCP 26(b) is broad. see *EEOC v. Caesars Entertainment, Inc.* **237 F.R.D. 428, 431-32 (D. Nev. 2006).** Even if the Court considers defendant's broad and blanket arguments, their claims of privilege does not protect facts from discovery even if the source of those facts are attorneys. see *Cincinnati Bell Cellular Sys. Co. v. Ameritech Mobile Phone Servs. Of Cincinnati, Inc.,* **1995 WL 347799, at \*2 (Del. Ch. May 17, 1995) (citing I.B.M. v. Comdisco, Inc., 1992 WL 52143 (Del. Super. Ct. Mar. 11, 1992)).**

Defendants argue that Ms. Smith's request is broad even though Ms. Smith's requests show the exact opposite. Ms. Smith has requested communications with the subject matter of herself or Mrs. Peruzar (since the scheme was intricately tied to Mrs. Peruzar) from October 2017 to present that is in the possession of the named parties. Ms. Smith cannot tailor such a request anymore without losing out on relevant evidence to each of her claims. Namely, that defendant and their cohorts targeted Ms. Smith beginning in November 2017 to terminate Mrs. Peruzar, prevent Mrs. Peruzar from being reinstated, and retaliate against Mrs. Peruzar, including but not limited to creating fabricated and drudged up messages and alleging that Ms. Smith committed such crimes. As seen in evidence presented, defendant's schemes caused great concern amongst those in their inner circle who defected. Even if Ms. Smith cannot determine who those anonymous persons were through discovery, their messages are substantial and further supported by the audio evidence.

Ms. Smith's forensic examination requests specifically states that privileged information concerning other, unrelated matters will be excluded using search parameters. Again, Ms. Smith tailors the forensic examination to the subject matter of herself or Mrs. Peruzar from October 2017 to present. Ms. Smith also specifically inserts that the forensic examination does not seek a "free for all" search of the devices central to the case. Ms. Smith presents the argument and importance for such a search in her Motion to Compel and highlights the authority of the Court to order further parameters than those that were set out in the motion. However, the detailed parameters set out by Ms. Smith in the motion are the typical standards that Courts have set when parties were ordered to allow e-discovery.

Ms. Smith's subpoena which also requires that Ms. Smith be allowed access to Fennemore offices is directly related to the forensic examination of those subject's computers. It is unclear where

Fennemore gets the idea that Ms. Smith will be walking around their offices "snooping" through whatever she sees fit. Ms. Smith does not seek information, nor does she care for information outside of that concerning herself and Mrs. Peruzar.

Fennemore concedes in their motion that the witnesses do, in fact, also use their personal devices to conduct communications, such communications are open to discovery if they fall within the scope of Ms. Smith's requests.

Fennemore cannot force Ms. Smith to disclose her deposition questions just as Ms. Smith cannot force Fennemore to disclose their deposition questions. It is improper and unheard of. The Rules of Civil Procedure 26 set parameters for the discovery that may be sought. To impose restrictions beyond the scope of Civil Procedure will prejudice the Plaintiff by preventing her from seeking relevant information during the depositions. In addition, defense is free to make objections during a deposition.

Defendants also argue that the subpoenaed witnesses were only minimally involved, only as counsel (Ms. Smith contends this is untrue). The subpoenaed witnesses were involved and hands-on in the claims surrounding this case from the very beginning. In fact, out of the thirty (30) witnesses that Ms. Smith has estimated for depositions, these witnesses were chosen due to their high level of involvement in the conspiracy and their relation to the main factual contentions contained in defendant's motions. Indeed, it is a known fact that some of these witnesses maliciously sought TPOs against Ms. Smith based on fabricated evidence without even knowing who Ms. Smith was (except by way of being instructed and/or stalking Ms. Smith) and never having interacted with Ms. Smith, which is highly telling in and of itself.

**Work Product Doctrine**

The scope of relevant discovery under FRCP 26(b) is broad. see *EEOC v. Caesars Entertainment, Inc.* 237 F.R.D. 428, 431-32 (D. Nev. 2006). In addition to the crime-fraud exception pled by Plaintiff, a party seeking discovery may also overcome the work-product privilege if they can show that they have a substantial need for the materials to prepare their case and they cannot obtain the substantial equivalent of the other party's work product through "other means" without "undue hardship" (FRCP 26(b)(3). Also, "if the materials sought are opinion work-product then a court may compel discovery only if the party seeking the materials demonstrates a compelling need for the information." *Brady,* 238 F.R.D. at 443; accord *S.E.C. v. Cuban,* No. 3:08-cv-2050-D, 2012 WL 456532, at *2 & n.3 (N.D. Tex. Feb. 10, 2012). Since Fennemore Craig, the defendant in this case, exclusively hold the relevant evidence central to the facts of the case, Ms. Smith cannot get that relevant evidence from anyone else. Indeed, any

notes, impressions, or communications in possession of Fennemore Craig related to Ms. Smith and Mrs. Peruzar would further provide that Fennemore Craig engaged in a conspiracy and sought to use the legal system and other nefarious tactics to aid their cohorts in targeting Ms. Smith in retaliation against Mrs. Peruzar. Any impressions, such as how Fennemore decided to target Ms. Smith and connect her to fabricated evidence, are relevant to the claims presented by Ms. Smith in her Complaint and is not in the possession of any other party except Fennemore Craig.

The other main problem with defendant's broad and blanket claims of privilege is that there is no detail or indication of whether any communications, related to Ms. Smith's requests, were prepared in anticipation of litigation rather than in anticipation to engage in a conspiracy.

**Privacy**

The scope of relevant discovery under FRCP 26(b) is broad. see *EEOC v. Caesars Entertainment, Inc.* 237 F.R.D. 428, 431-32 (D. Nev. 2006). Defendant admitted in their motion that the employees at subject in the subpoenas use their personal devices for "business" and use them to send communications concerning matters related to Fennemore Craig, which is of direct issue in this case. More specifically, these employees used their personal devices to send and receive communications directly related to Ms. Smith and Mrs. Peruzar as they were all involved in the long-running scheme; this is aside from just texting or chatting with friends and family. The employees' communications include but are not limited to discussing the means by which they would target Ms. Smith using the legal system as a vehicle for their nefarious plans. The need for such communications, given the claims central to this case outweigh defendant's assertion that Ms. Smith will infringe on their privacy rights by seeking other, non-related communications, especially where, in this case, parameters have been proposed and can be implemented to prevent the disclosure of non-related communications.

As explained in Plaintiff's Motion to Compel and given that it has already been shown that defendant possesses the propensity to fabricate evidence (including the message attached to this instant motion), such evidence must also be verified through forensic examination. Ms. Smith has tailored her search to specific subjects and to a specific time frame, and, again, because Ms. Smith cannot retrieve this relevant information via any other source, the need to obtain it (and verify that it is not fabricated) from defendant is evident.

**Burden**

Defendant bears the burden of demonstrating with sufficient detail or "a compelling showing" that the Subpoena requests are unduly burdensome. see *Int'l Bhd. Of Teamsters, Airline Div. v. Frontier*

*Airlines, Inc.*, Nos. 11-cv-02007-MSK-KLM, 2012 WL 1801979, at *7 (D. Colo. May, 16, 2012); *Western Convenience Stores, Inc. v. Suncor Energy (U.S.A.) Inc.*, No. 11-cv-01611-MSK-CBS, 2014 WL 1257762, at *6 (D. Colo. Mar. 27, 2014). Defendant fail to show how a forensic examination lasting, at max, up to one day for acquisition, would burden subjects and only cite a blanket claim that witnesses would not be able to perform duties or communicate with family members. Defendant does not cite witnesses' access to cell phones other than their "business" phones or access to other public/company computers. As explained above and in Ms. Smith's Motion to Compel, the need for the evidence central to this case, contained on witnesses' personal devices, outweigh their momentary and unspecific discomforts. The witnesses, as admitted by defendant, used their personal devices to engage in communications concerning their efforts to target Ms. Smith, which is at direct issue in this case and which cannot be reasonably obtained from any other source.

### Relevancy

Defendant only argues that Ms. Smith's inspection request is irrelevant (implying that all of Ms. Smith's other requests are relevant to the case), and they also misinterpret Ms. Smith's inspection request, which is directly tied to the request for forensic examination of witnesses' computers, including their office computers. Ms. Smith's does not request to scope out Fennemore Craig's offices, thus, because that is not a request made by Ms. Smith, it will not be addressed.

**C.**

Ms. Smith's subpoenas do not contain any procedural defects. FRCP 45(c) has two parameters for attending deposition. The first allows for a person to attend deposition 100 miles of where they reside, are employed, or regularly transact business in person. The second allows for a person to attend deposition in the state where the person resides, is employed, or regularly transacts business if the person is a party or a party's officer; or if they are commanded to attend trial and would not incur substantial expense. Fennemore has attempted to characterize their "directors" as non-parties and they are not, as explained in Ms. Smith's Motion to Compel. Any other parties conduct business in Las Vegas, NV in connection with Fennemore's Las Vegas office, thus, Ms. Smith properly served subpoenas compelling deposition attendance in Las Vegas, NV.

Ms. Smith recently had to stop the witness fee transaction to Ms. Braselton due to defendant's insistence that she would not show up to any deposition absent a court order. Ms. Smith's process service is done via internet, so witness fees must be delivered via certified mail. Due to the time sensitive nature of money orders, Ms. Braselton's witness fees have been stopped and held pending resolution of

these matters as defense already informed Ms. Smith that Ms. Braselton would not show up and "**We therefore suggest that you take whatever steps are necessary to reduce the expense you may incur by having reserved those dates.**"

D.

Defendant has failed to identify what cause has been shown for this Court to issue them a protective order—annoyance, embarrassment, oppression, or undue burden or expense. Directly opposite to that requirement, defendant inserts that they cannot show good cause but it's ok because the court has discretion to issue one anyway. Defendant then makes a blanket claim that Ms. Smith's subpoenas warrant the need for a protective order without making any substantive argument about how the subpoenas were improper or rise to the level in which a protective order is warranted. Based on these facts alone, defendant's request should be denied.

In defendant's meet and confer letter to Plaintiff, defendant never cited anything about "fears" concerning complying with the subpoenas (FRCP 26(c)). Now, as a new ploy, which Ms. Smith vehemently opposes as the most despicable tactic, defendant inserts Ms. Smith's contentious, private medical records and assert completely unfounded allegations to prevent witnesses from testifying at deposition. Defense's tactics must be seen for what they are—outright refusals to comply with any orders or discovery in this case.

Defense's assertions that Ms. Smith has proclaimed "struggles" with homicidal thoughts is false. Defense's assertions that Ms. Smith has ever issued threats is equally false and completely unfounded. Defense's insertion of a message created by the witnesses at subject in this case lacks any substantive basis for issuing a protective order against Ms. Smith. All of defense's new "fear" arguments fail as they are all personal and trumped up assumptions that are not based in any type of fact or logical reasoning. Defendant has failed to provide any evidence/reasonable arguments on issuing a protective order which would prevent Ms. Smith from conducting a deposition of the witnesses, at the named location on the subpoenas, in the presence of their attorney and a certified court reporter.

In addition, defense's request that this Court limit Ms. Smith's discovery regarding the claims of her Complaint, basically asking this Court to go beyond the rules already governing discovery to grant defendant special treatment, should be denied. Ms. Smith is entitled to ask about a deponent's background information, just as all attorneys are, and defendant has not asserted a reason as to why this Court should impose a special order preventing Ms. Smith from asking background questions and requiring Ms. Smith to provide a list of questions beforehand. Defendant keeps citing "for good cause,"

11

but fail to state what that good cause is. As such, Plaintiff will not present any more argument regarding the matter where no argument has been presented by defendant, and their request for a protective order should be denied.

## CONCLUSION

Defendant has failed to meet the standards required to quash Plaintiff's subpoenas and, thus, defendant's motion should be denied in its entirety. Plaintiff's Namely, defendants just assert blanket claims, have failed to describe how Plaintiff's requests are irrelevant to the subject matter, and have failed to show how Plaintiff's claims are burdensome. Again, it is the defendant, not the Plaintiff, who holds the burden in demonstrating that they should not comply with a discovery request. Although Plaintiff finds the forensic examination parameters, in her subpoenas and Motion to Compel, to be reasonable and a standard method for Courts, Plaintiff does not object to this Court setting other logical parameters concerning the forensic examination. Such an example can be found in the case of **Armour v. Wilson, No. 12-cv-851 RAJ (W.D. Wash. 2013)**. Plaintiff's cross motion to seal medical records, issue permanent injunctive relief, and issue a permanent protective order should be granted; it is evident that defense and defendant are completely unhinged as their new ploy to prevent the Plaintiff from conducting discovery included asserting outright lies and attempting to use the Plaintiff's private medical records to support such lies. Plaintiff's medical records are not at issue in this case and there is no need for defendant to continue to insert such a record into any flamboyant argument they choose to make. Defendant's only goal is to cause vexation. In addition, defendant's continued distribution of such records is a direct violation of HIPAA laws and defendant seeks to use the record to cause undue prejudice in the case.

Dated this 22nd day of August 2019

/s/ Latonia Smith
LATONIA SMITH
9748 CANYON LANDING AVE.
LAS VEGAS, NV 89166

# EXHIBIT A

1  go, so she thought everything was okay.

2      Q.   Were you present when Ms. Peruzar was asked by
3  Araceli Chavez about the missing money?

4      A.   No.

5      Q.   So what you're testifying about is what
6  Ms. Peruzar told you later had happened?

7      A.   And the company.  They verified that she
8  did -- they called her.

9      Q.   So Planet Hollywood, as part of its
10 investigation, asked Ms. Peruzar about the missing money
11 and Ms. Peruzar said she thought it was a tip, and from
12 then on Planet Hollywood carried on its investigation;
13 is that right?

14     A.   Yes.

15          MS. WEBER:  Objection.  Form.

16          MS. PERUZAR:  What was the answer to that?
17 I'm sorry.

18     A.   Yes.

19 BY MS. PIERCE:

20     Q.   You said there was a point where somebody from
21 Caesars or Planet Hollywood talked to you about
22 Ms. Peruzar's daughter; is that right?

23     A.   They made comments.

24     Q.   Who from either of those companies made a
25 comment to you about Ms. Peruzar's daughter?

Case 2:19-cv-00824-GMN-EJY   Document 40   Filed 08/22/19   Page 15 of 19

Teri Lynn Pringle                                              Annecer Peruzar v. Caesars Entertainment Corporation, et al.

```
 1        A.   I think it started from Samantha and Yolanda.
 2        Q.   Samantha was employed at Planet Hollywood; is
 3   that right?
 4        A.   Yes.
 5        Q.   And when Ms. Mationg talked to you about
 6   Ms. Smith, was it your understanding she was also
 7   talking to you on behalf of Planet Hollywood?
 8        A.   Can you repeat that?
 9        Q.   Sure.
10             When Ms. Mationg was speaking to you about
11   Ms. Peruzar's daughter, was it your understanding that
12   Ms. Mationg was speaking to you on behalf of Planet
13   Hollywood?
14        A.   Yes.
15        Q.   What specifically did Ms. Radak say to you
16   about Ms. Peruzar's daughter?
17        A.   I remember her saying there was some Facebook
18   post or something from her daughter, and I asked for
19   those.  They said they will not give them to me because
20   it's not the reason she's being terminated.  And I then
21   told them then they cannot use it for a reason not to
22   bring her back and they can't use it in the arbitration.
23        Q.   So what Ms. Radak said to you was that there
24   were some Facebook posts from the daughter.  You then
25   asked for them, Planet Hollywood would not provide them,
```

Case 2:19-cv-00824-GMN-EJY   Document 40   Filed 08/22/19   Page 16 of 19

Teri Lynn Pringle                                    Annecer Peruzar v. Caesars Entertainment Corporation, et al.

1  and you said then, "You can't use them as a basis for
2  Ms. Peruzar's termination."
3          Have I accurately summarized the conversation?
4     A.  No.
5     Q.  Please tell me what happened.
6     A.  The company told me, "This is not the basis
7  for her termination," so it's not part of her grievance.
8  And I told them, "Then you can't use it as a basis for
9  not bringing her back and you can't use it in
10 arbitration."
11    Q.  Okay.  So I want to make sure I got it
12 correct.
13         The first thing that Ms. Radak said to you was
14 that there was a Facebook post from Ms. Peruzar's
15 daughter; is that right?
16    A.  Yes.
17    Q.  You then asked for a copy of the Facebook
18 post; is that right?
19    A.  Yes.
20    Q.  And Planet Hollywood said that it would not
21 provide the post because it wasn't the reason that
22 Ms. Peruzar's employment was terminated?
23    A.  Yes.
24    Q.  And at that point, you said then the company
25 cannot use the post as a basis for not bringing

Case 2:19-cv-00824-GMN-EJY   Document 40   Filed 08/22/19   Page 17 of 19

Teri Lynn Pringle                                    Annecer Peruzar v. Caesars Entertainment Corporation, et al.

1    Ms. Peruzar back and can't use it in arbitration; is
2    that right?
3        A.  Yes.
4        Q.  Is there anything else about the conversation
5    you had with Ms. Radak other than what we just talked
6    about?
7        A.  No.
8        Q.  Did Ms. Radak tell you what was said inside
9    the Facebook post?
10       A.  No.
11       Q.  You also said that Yolanda Mationg had a
12   conversation with you about Ms. Peruzar's daughter.  Is
13   it the same conversation we just discussed with
14   Ms. Radak or was it a separate conversation?
15       A.  We had a separate conversation.
16       Q.  And what did Ms. Mationg say to you in the
17   separate conversation in which she talked to you about
18   Ms. Peruzar's daughter?
19       A.  She called me Christmas morning and said I
20   need to do something, to talk to Annecer about her
21   daughter because she's still sending posts.
22       Q.  What did you say in response?
23       A.  I told her I cannot control her daughter, that
24   she would have to find another way.
25       Q.  Was there anything else that you discussed

Case 2:19-cv-00824-GMN-EJY   Document 40   Filed 08/22/19   Page 18 of 19

Teri Lynn Pringle                                    Annecer Peruzar v. Caesars Entertainment Corporation, et al.

1   with Ms. Mationg about Ms. Peruzar's daughter other than
2   what you've just told me?
3       A.  I don't think so.
4       Q.  Did Ms. Mationg tell you what was in the
5   subsequent posts that she was calling about?
6       A.  No, just threats of some sort.  I don't know.
7       Q.  Did Ms. Mationg use the word "threats"?
8       A.  Yes.
9       Q.  But you don't know what kind of threats they
10  were?
11      A.  No.
12      Q.  Do you know how it is that Planet Hollywood
13  came to believe that Ms. Peruzar's daughter was the one
14  sending the Facebook posts?
15      A.  No.  Her name was on it, I think.  I don't
16  know.  I really don't.
17      Q.  Other than those two conversations -- one with
18  Ms. Radak, one with Ms. Mationg -- has there been any
19  point where anyone from Planet Hollywood or Caesars
20  Corporation talked to you about Ms. Peruzar's daughter?
21      A.  No.
22      Q.  What was your reaction when you heard that
23  Ms. Peruzar's daughter had sent a threat?
24      A.  I don't know I had a reaction, other than
25  saying, "I need to see that."

## CERTIFICATE OF SERVICE

I certify that I am serving a true and correct copy of the attached OPPOSITION TO EMERGENCY MOTION on the parties set forth below by:

_____ placing an original or true copy thereof in a sealed envelope with the correct prepaid postage affixed for collection and mailing in the United States Mail, at Las Vegas, Nevada.

__X__ Certified Mail, Return Receipt Requested of the document(s) listed above to the person(s) at the address(es) set forth below

_____ E-service

_____ Personal delivery through a process server of the document(s) listed above to the person(s) at the address(es) set forth below

Riley Clayton
HALL JAFFE & CLAYTON, LLP
7425 Peak Drive
Las Vegas, NV 89128
702-316-4111
rclayton@lawhjc.com

Alex Fugazzi and Michael Paretti
SNELL AND WILMER
3883 Howard Hughes Parkway Suite 1100
Las Vegas, NV 89169
702-784-5200
afugazzi@swlaw.com
mparetti@swlaw.com

/s/ Latonia Smith

Plaintiff, In Proper Person

Dated this 22nd day of August 2019

13