Alex L. Fugazzi (Nevada Bar No. 9022)
Michael Paretti (Nevada Bar No. 13926)
SNELL & WILMER L.L.P.
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
Telephone: 702.784.5200
Facsimile: 702.784.5252
afugazzi@swlaw.com
mparetti@swlaw.com

*Attorneys for Defendant Fennemore Craig*

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| LATONIA SMITH,<br><br>        Plaintiff(s),<br><br>-vs-<br><br>FENNEMORE CRAIG,<br><br>        Defendant(s). | Case No.:   2:19-cv-00824-GMN-EJY<br><br>**FENNEMORE CRAIG AND THE NONPARTY FENNEMORE EMPLOYEES' REPLY IN SUPPORT OF THEIR EMERGENCY MOTION TO QUASH, OR IN THE ALTERNATIVE, MOTION FOR A PROTECTIVE ORDER**<br><br>**ORAL ARGUMENT REQUESTED** |

Defendant Fennemore Craig ("Fennemore") and nonparties Brenoch Wirthlin, Shawna Braselton, Brandi Planet, Wade Beavers, Shannon Pierce, Leslie Bryan Hart, and Janice Procter-Murphy[1] (collectively, the "Fennemore Employees"), by and through their counsel of record, Snell & Wilmer L.L.P., hereby submit their Reply in support of their Emergency Motion to Quash, or in the Alternative, Motion for a Protective Order [ECF No. 37].

---

[1] Ms. Procter-Murphy resides in Arizona but is willing to make herself available in Nevada for the limited purpose of appearing for deposition if this Court orders that her deposition will go forward. By doing so, Ms. Procter-Murphy reserves all rights and waives none, including any other jurisdictional rights she has.

- 1 -

4838-4681-4370

This Reply is based on the attached memorandum of points and authorities, the papers and pleadings on file with the Court, and such other written or oral argument and other materials that may be presented prior to the Court's decision on this motion.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.  INTRODUCTION AND BACKGROUND

Not only should the Court quash the Subpoenas as improper under Nevada law, it should also issue a Protective Order because Fennemore and the Fennemore Employees have a legitimate basis to believe Ms. Smith is a threat. Ms. Smith's representations to the Court that she has not threatened anyone related to this litigation are demonstrably untrue,[2] and Fennemore must correct these misrepresentations. For example, on April 17, 2019, following a hearing in the Peruzar Litigation, Ms. Smith threatened to "f*ck up" Fennemore attorney Shannon Pierce and punch her in the face.[3] The security footage from the Eighth Judicial District Court corroborates this interaction; Ms. Smith can be seen waiting for Ms. Pierce outside of the courthouse elevator bank, following Ms. Pierce, and confronting Ms. Pierce.[4] This evidence, of course, directly contradicts Ms. Smith's prior sworn declaration that: (1) she was talking to her mother on the first floor of the courthouse[5] (compare to Ex. J, where Ms. Smith can be observed waiting alone to approach Ms. Pierce); (2) that she "never even spoke to Pierce and her associate"[6] (compare to Ex. H, where Ms. Smith can be heard threatening to punch Ms. Pierce in the face); and (3) that the audio recording appears to be from a conversation Ms. Smith was having with her mother and captured from far

---

[2] See Pl.'s Resp., ECF No. 40, at 3:27-28 (stating that Fennemore's allegations that Ms. Smith has a history of threats and harassing behavior are "completely unfounded"); 5:19-20 ("Defense's false assertions that Ms. Smith sent threats to previously unknown third party, Ms. Radak, is completely unfounded and not based in any fact."); 5:21-22 ("Defense's false assertions that Ms. Smith threated [sic] Shannon Pierce and previously unknown third party, Ethan Thomas, is completely unfounded and not based in any fact."); 5:23-24 ("Defense's false assertions that previously unknown third parties Shawna Braselton and Wade Beavers were threatened by Ms. Smith is equally, completely unfounded and not based in any fact."); 11:17 ("Defense's assertions that Ms. Smith has ever issued threats is equally false and completely unfounded.")
[3] See Declaration of Shannon Pierce ("Pierce Decl."), attached as **Exhibit G**, at ¶¶ 2-6; see also April 17, 2019 Audio Recording of Ms. Smith, manually filed as **Exhibit H**; transcript of April 17, 2019 altercation, attached as **Exhibit I**.
[4] See Pierce Decl., Ex. G, at ¶ 7; see also April 17, 2019 Video Footage, manually filed as **Exhibit J**.
[5] See April 22, 2019, Declaration of Latonia Smith, attached as **Exhibit K**, at ¶ 6.
[6] Id. at ¶ 7.

-2-

away[7] (compare to Ex. J, again showing Ms. Smith was not with her mother and approached Ms. Pierce). And the Court should not consider these threats in a vacuum; rather, it should consider them in the context in which they occurred. Just days later, Fennemore Employees Shawna Braselton and Wade Beavers (both of whom work with Ms. Pierce on the Peruzar Litigation) received an "anonymous" letter exclaiming: **"IT'LL BE THE END OF LIVES . . . EMBODYING THE RAGE OF ALL MASS MURDERERS . . . WILL NEVER SEE IT COMING . . . IT WILL BE LIGHTS OUT"** and **"CONGRATULATIONS YOU HAVE JUST BEEN ADDED TO THE HIT LIST . . . NO ONE IS WALKING AWAY UNSCATHED . . . P.S. CONGRATS ON YOUR WEDDING SHAWNA. HOPEFULLY YOU WILL BE AROUND FOR MANY YEARS TO ENJOY IT."** Ex. E (emphasis and capitalization in original).

Ms. Smith, on the other hand, asserts (with no evidence and nothing more than her say-so) that there is some conspiracy and nefarious intent attributable to everyone she crosses paths with in this case. Ms. Smith has attacked: (1) Caesars and PHWLV (alleging that they terminated Ms. Peruzar "based solely on the fact that she was African American"[8] and that Caesars and PHWLV filed an application for a temporary protective order against Ms. Smith in a "hate-filled, retaliatory agenda"[9]); (2) Samantha Radak, the individual who informed Ms. Peruzar that her employment was terminated (Ms. Radak received various emails and social media posts, many sent through pseudonyms, calling Ms. Radak "racist," a "bigot," a "piece of trash," and saying "b*tch die"[10]); (3) Fennemore (alleging that Fennemore has a "hate of African Americans in general"[11] and calling the law firm "an organized ring of white-collar thugs,"[12] who are "no different from white supremacists"[13]); (4) Ms. Pierce (asserting in a publicly-filed affidavit that "Attorney Shannon Pierce (if she can even be called that) is a lying, lonely, bitter old woman and it seems as though she has a cognitive deficiency"[14] and calling Ms. Pierce "one of those disgraces to the professional

---

[7] *Id.* at ¶ 8.
[8] ECF No. 1, at 5:4-5.
[9] ECF No. 1, at 6:5-6.
[10] *See* Pierce Decl., Ex. G, at ¶ 8; *see also* various social media posts and messages, attached as **Exhibit L**.
[11] ECF No. 1, at 3:14.
[12] ECF No. 21, at 5:6.
[13] ECF No. 55 in related Case No. 2:19-cv-00856-GMN-DJA, at 17:22-23.
[14] April 16, 2019 Affidavit of Latonia Smith, attached as **Exhibit M**, at ¶1.

-3-

community."[15]); (5) Fennemore's counsel (asserting that "These people [Fennemore and its counsel] obviously have a problem with African Americans and are no different from white supremacists as evidenced by their hateful rhetoric and continued malicious actions,"[16] calling counsel bottom-feeders,[17] and stating that counsel "have no moral or ethical compass"[18]); (6) the Court (arguing that "the only reason why . . . the court is holding on to the case is for delay, prejudicing Plaintiff in discovery."[19]); (7) the Justice Court judges (Ms. Smith asserts without any evidentiary support that "the justice court judges that issued automatic temporary orders are currently under investigation for their issuance of even those temporary orders to defendant that were not substantiated by evidence of stalking, harassment, or aggravated stalking on the part of Ms. Smith."[20]); and now (8) the medical professionals who treated her (Ms. Smith claims that the medical professional who treated her, and who recorded their treatment of her in the medical records, "created their own storyline surrounding Ms. Smith's reasons for being hospitalized after Ms. Smith would not communicate the causes (all of which were inaccurate).”[21]).

Beyond the misrepresentations and contradictions, Ms. Smith's Response fails on the merits. Ms. Smith's Subpoenas seek information and documents expressly protected by the attorney-client privilege. In Ms. Smith's own words: "***The subpoenaed witnesses were involved and hands-on in the claims surrounding this case from the very beginning***. In fact, out of the thirty (30) witnesses that Ms. Smith has estimated for depositions, ***these witnesses were chosen due to their high level of involvement in the conspiracy and their relation to the main factual contentions contained in defendant's motions***." ECF No. 40, at 8:11-14. The communications Ms. Smith seeks—communications made between Fennemore attorneys and their clients—are the quintessential example of attorney-client privileged information.

---

[15] *Id.*
[16] ECF No. 55 in related Case No. 2:19-cv-00856-GMN-DJA, at 17:22-23.
[17] ECF No. 40, at 2:5.
[18] ECF No. 40, at 2:1.
[19] ECF No. 27, at 1:24-25
[20] ECF No. 21 at 22:7-10. Despite Ms. Smith's contentions, the Justice Court heard evidence on both hearings before issuing temporary protective orders against Ms. Smith.
[21] ECF No. 40, at 2:14-16. *See Shell Oil Co. v. Indus. Commn.*, 119 N.E.2d 224, 231 (Ill. 1954) (discussing an exception to the hearsay rule explaining that it is presumed that a person will not falsify statements to a physician from whom she expects and hopes to receive medical aid).

-4-

In an attempt to circumvent the attorney-client privilege, Ms. Smith next contends that the "crime-fraud" exception entitles her to privileged information. Ms. Smith's position is misguided and the case law upon which she relies belies her position. Ms. Smith has presented no evidence to substantiate such a claim, nor can she support this completely baseless contention.

Additionally, Ms. Smith ignores the burden associated with responding to the nineteen subpoenas—especially considering that all potentially responsive documents would be subject to the attorney-client privilege, protected by the work-product doctrine, or both. It is unduly burdensome to force Fennemore to produce a log of every communication it had and continues to have with its clients, Caesars and PHWLV, in current and active litigation, and it is unduly burdensome to force the Fennemore Employees to surrender their cell phones and/or other personal electronic devices. The Court must keep in mind that Ms. Smith is requesting the personal electronic devices of people that reasonably believe Ms. Smith threatened them.

What's more, Ms. Smith misstates the procedure of this case. The Court has not yet considered Fennemore's Motion to Stay Discovery on the merits.

Finally, as is apparent from just a brief review of the record, Fennemore did not publicly file Ms. Smith's medical records in its Motion. Indeed, even though Fennemore does not believe Ms. Smith's medical records merit sealing because the records and related information were previously disclosed when Ms. Smith and/or her mother publicly filed and disclosed Ms. Smith's medical records in another matter (and left them in the public record for months),[22] Fennemore took special precaution to file a Motion to Redact and Seal Documents, requesting to redact portions of its Motion relating to Ms. Smith's medical records and to seal the corresponding exhibit containing her medical records. *See* ECF No. 38.

---

[22] ECF No. 38, at 3:5-7; *see also* August 2, 2019 Deposition Transcript of Brandon Trout, attached as **Exhibit N**. Mr. Trout, Ms. Smith's mother's former counsel, testified that Ms. Smith told him it was actually Ms. Smith, not her mother, who drafted the motions for summary judgment, which included the subject medical records. Ex. D at 62:6-12 (testifying that Ms. Smith "stated that she had aided in preparing a motion for summary judgment in this [the Peruzar] case."), 62:13-24 (testifying that "I believe that in essence [Ms. Smith] drafted the motion for summary judgment."). Accordingly, it appears that it was Ms. Smith who placed her own medical records in the public record. *Id.*

-5-

4838-4681-4370

Each of Ms. Smith's arguments fail, and the Court should quash Ms. Smith's improper and abusive Subpoenas.

## II. LEGAL ARGUMENT

### A. Ms. Smith's Response Underscores the Privileged Nature of the Information she Seeks.

While Ms. Smith claims that "the evidence being sought is not privileged at all and is subject to discovery given the facts of this case," the documents and testimony she seeks tell a different story. By her own contentions, Ms. Smith "has requested communications with the subject matter of herself or Mrs. Peruzar (since the scheme was intricately tied to Mrs. Peruzar) from October 2017 to present that is in the possession of the named parties." ECF No. 40, at 7:10-13. Tellingly, Ms. Smith explains: "The subpoenaed witnesses were involved and hands-on in the claims surrounding this case from the very beginning. In fact, out of the thirty (30) witnesses that Ms. Smith has estimated for depositions, these witnesses were chosen due to their high level of involvement in the conspiracy and their relation to the main factual contentions contained in defendant's motions." ECF No. 40, at 8:11-14. Ms. Smith herself acknowledges she chose these witnesses due to their involvement in the Peruzar Litigation, which remains highly active to this day. In other words, Ms. Smith is asking the Court to order opposing counsel of record (Fennemore) in her mother's lawsuit against their clients (Caesars and PHWLV) to produce her mother's file in an active lawsuit. The communications between Fennemore and its clients regarding the Peruzar Litigation are expressly privileged.

In response, Ms. Smith contends she is entitled to attorney-client and/or work-product privileged information because "There is no privilege where a client and lawyer consult or uses materials for the purpose of committing a crime or furthering a fraud." ECF No. 40, at 6:21-22. Ms. Smith's reliance on the "crime-fraud" exception is misguided and the case law upon which she relies belies her position.

Under the crime-fraud exception, the attorney-client privilege "ceases to operate at a certain point, namely, where the desired advice refers *not to prior wrongdoing*, but to *future wrongdoing*. It is the purpose of the crime-fraud exception to the attorney-client privilege to assure that the 'seal

of secrecy' between lawyer and client does not extend to communications made for the purpose of getting advice for the commission of a fraud or crime." *U.S. v. Zolin*, 491 U.S. 554, 562–63 (1989) (emphasis in original).

In *Zolin*, the Supreme Court held that the party seeking *in camera* review must make some threshold showing that such review is appropriate. In addressing this issue, the Supreme Court attended to the detrimental effect of *in camera* review on the policies underlying the privilege and on the orderly administration of justice in the courts. The Court noted that "examination of the evidence, even by the judge alone, in chambers" might in some cases "jeopardize the security which the privilege is meant to protect." *Id.* (quoting *United States v. Reynolds*, 345 U.S. 1, 73 S.Ct. 528, 533 (1953)). Indeed, "[t]oo much judicial inquiry into the claim of privilege would force disclosure of the thing the privilege was meant to protect, while a complete abandonment of judicial control would lead to intolerable abuses." *Id.* at 570.

The *Reynolds* Court declined to "go so far as to say that the court *may automatically require* a complete disclosure to the judge before the claim of privilege will be accepted *in any case*." 345 U.S., at 10, 73 S.Ct., at 533 (emphasis added). In adopting the rationale of *Reynolds*, the *Zolin* Court held that "A blanket rule allowing *in camera* review as a tool for determining the applicability of the crime-fraud exception . . . would place the policy of protecting open and legitimate disclosure between attorneys and clients at undue risk." *Zolin*, 491 U.S. at 571. "There is no reason to permit opponents of the privilege to engage in groundless fishing expeditions, with the district courts as their unwitting (and perhaps unwilling) agents." *Id.*

The party asserting the crime-fraud exception must satisfy a two-part test. *Lewis v. Delta Air Lines, Inc.*, No. 2:14-CV-01683-RFB-GWF, 2015 WL 9460124, at *2 (D. Nev. Dec. 23, 2015). First, "the party must show [by a preponderance of the evidence] that the client was engaged in or planning a criminal or fraudulent scheme when it sought the advice of counsel to further the scheme." *Id.* (citing *In re Napster, Inc. Copyright Litigation*, 479 F.3d 1078, 1090 (9th Cir. 2007)). Second, the party "must demonstrate that the attorney-client communications for which production is sought are sufficiently related to and were made in furtherance of the intended, or present, continuing illegality." *Id.* (internal quotations omitted). "In civil actions, where outright disclosure

-7-

of the attorney-client communication is sought, the party asserting the crime-fraud exception has the burden of proving that the exception applies by a preponderance of the evidence." *Id.* "The court should make that decision in light of the facts and circumstances of the particular case, including, among other things, the volume of materials the district court has been asked to review, the relative importance to the case of the alleged privileged information, and the likelihood that the evidence produced through *in camera* review, together with other available evidence then before the court, will establish that the crime-fraud exception does apply." *Id.*

First, Ms. Smith has not identified a crime or a fraud. Instead, it appears Ms. Smith believes she is entitled to attorney-client privileged information because Fennemore and its clients have *allegedly* conspired against her. Ms. Smith does not allege any purported fraud, and only makes the vague, conclusory assertion that "It is no surprise that Fennemore will try to hide behind broad claims of privilege to avoid handing over evidence that implicate themselves in fraudulent and criminal activity." Ms. Smith's rhetoric is insufficient to circumvent the attorney-client privilege.

Second, even under the crime-fraud exception to the attorney client privilege, the party seeking the privileged information is not entitled to that information; rather, the party opposing privilege must present evidence sufficient to support reasonable belief that an *in camera* review of the documents may yield evidence establishing the exception's applicability before the district court may engage in in camera review. *See U.S. v. Zolin*, 491 U.S. 554, 570 (1989).

Ms. Smith has not met her burden of establishing an adequate factual basis to support a good faith belief by a reasonable person that *in camera* review of the documents she seeks may reveal evidence to establish the claim that the crime-fraud exception applies, nor has she even suggested an *in camera* review is warranted. Indeed, Ms. Smith's entire claim is based on conjecture that Fennemore is conspiring against her. Ms. Smith has not even adequately pleaded this claim, let alone presented any factual basis to support this allegation. *See* ECF No. 11 at 12:23-13:2 (arguing for dismissal of Ms. Smith's Complaint under FRCP 12(b)(6) because Ms. Smith's civil conspiracy claim is supported by a sole, conclusory allegation that "The defendant(s) intended to accomplish the unlawful objective of intimidating a witness in a current and separate litigation and furthering their defendants' goal of retaliating against Mrs. Annecer Peruzar."). Because Ms.

-8-

4838-4681-4370

Smith has not (and cannot) meet her burden, *in camera* review of the documents she seeks is improper and unjustified.

Ms. Smith's claims regarding the work product doctrine likewise fail. Yet again, the very case Ms. Smith relies upon to support her position belies her arguments. In *S.E.C. v. Brady*, the Northern District of Texas Court held that qualified protection under the work product doctrine extends to documents and tangible things including a lawyer's research, analysis of legal theories, mental impressions, notes, and memoranda of witnesses' statements. 238 F.R.D. 429, 441 (N.D. Tex. 2006). The court held that information obtained from the company's law firm's interviews with the company's officers, directors, and employees, which resulted in a report regarding potential securities claims against the company, and the documents reviewed or relied upon in the preparation of the report constituted opinion work product for discovery purposes—it was prepared in anticipation of future litigation, and was suffused with legal conclusions and mental impressions regarding the interviews as well as legal advice. *Id.*

Like *Brady*, Ms. Smith has wholly failed to establish a compelling need for documents that are inherently protected by the attorney-client privilege and were also prepared in direct connection to litigation, including internal communications among counsel. To the extent that the Fennemore Employees are in possession of documents or communications pertaining to Ms. Smith, Ms. Peruzar, CEC, and PHWLV, Fennemore or the Fennemore Employees prepared all or virtually all of those documents in contemplation of very active litigation, or litigation just recently completed (the orders of protection), making the documents immune from disclosure. Ms. Smith is not entitled to these documents or communications.

**B.      The Documents and Information Ms. Smith Seeks is Unduly Burdensome and Disproportionate to the Needs of the Case.**

Ms. Smith's Response ignores the burden associated with responding to the nineteen subpoenas—especially considering that all potentially responsive documents would be subject to

4838-4681-4370

the attorney-client privilege,[23] protected by the work-product doctrine, or both. It is unduly burdensome to force Fennemore to produce a log of every communication it had with its clients, Caesars and PHWLV, for a period of nearly two years. Moreover, the burden of the Fennemore Employees surrendering their personal electronic devices vastly outweighs the value of the Fennemore Employees' personal information to Ms. Smith, especially considering the fact that Ms. Smith has not even attempted to propound proper, narrow, and relevant discovery requests on Fennemore. *See, e.g., Tingle v. Hebert*, No. 15-626-JWD-EWD, 2018 WL 1726667, at *7–8 (M.D. La. Apr. 10, 2018) (finding that "Defendants have also made no showing that the requested forensic examination of Plaintiff's personal cell phone and personal email accounts are proportional to the needs of this case" and holding that "[t]he utility of permitting a forensic examination of personal cell phones must be weighed against inherent privacy concerns") (internal quotations omitted).

The Fennemore Employees cannot be compelled to endure this undue burden, especially considering the procedure of the case, Ms. Smith's aggressive litigation tactics, and the fact that Ms. Smith's Complaint is subject to dismissal as fully articulated in Fennemore's Motions to Dismiss. *See* ECF Nos. 10, 11. Accordingly, the Court should quash Ms. Smith's Subpoenas based on the undue burden they impose and their disproportionality to the needs of the case alone.

**C.     The Court Should Hear and Decide Fennemore's Motion on an Emergency Basis.**

Fennemore properly moved for emergency relief pursuant to Local Rule 7-4, and Ms. Smith's arguments demonstrate why emergency adjudication of the Motion is appropriate. Ms. Smith's contentions that Fennemore asserted that it "would directly disobey the order of Judge Foley and stay discovery on their [sic] own"[24] and that "Judge Foley ordered that discovery should not be stayed and should begin"[25] are inaccurate. In reality, Magistrate Foley ordered that "Since neither party has filed a motion to stay discovery, the Court will set a 180-day discovery period, commencing from the date the motion to dismiss was filed." ECF No. 17, at 1:18-20. Magistrate

---

[23] If the responding party finds that it would be unduly burdensome to prepare and provide a privilege log to the plaintiff, the responding party may seek a protective order. *See* Fed. R. Civ. Pro. 26(b)(5) advisory committee comment; *Cross v. Jaeger*, 3:13-CV-00433-MMD, 2015 WL 1412845, at *5 (D. Nev. Mar. 27, 2015).
[24] ECF No. 40, at 3:2-5.
[25] ECF No. 40, at 4:6-8.

-10-

Foley noted that "This scheduling order can be amended pending the filing and ruling on the parties' motion to stay discovery." ECF No. 17, at 1:20-21. As such, Fennemore filed its Motion to Stay two days later. *See* ECF No. 19. That motion has been fully briefed[26] and remains pending before the Court; it has not been decided. Fennemore requests that the Court rule on the Motion to Stay and conduct a case management conference to put an end to Ms. Smith's abusive and improper litigation tactics.

While the Court can certainly permit Ms. Smith to change her previous position that a stay of discovery is warranted,[27] the fact that Ms. Smith issued nineteen subpoenas just days after asserting such position demonstrates her improper intent. And because these subpoenas seek immediate compliance, coupled with the fact that they seek privileged and undiscoverable information that would be unduly burdensome to review and log, warrants deciding the Motion on an expedited basis.

D. **Fennemore Did Not Publicly File Ms. Smith's Medical Records.**

Ms. Smith's contention that Fennemore "found it amusing to once again publicly file Plaintiff's medical records"[28] is flatly wrong. Despite the fact that Fennemore does not believe Ms. Smith's medical records merit sealing because the records and related information were previously disclosed when Ms. Smith's mother (and really, Ms. Smith) publicly filed Ms. Smith's medical records in another matter,[29] Fennemore took special precaution to file a Motion to Redact and Seal Documents, requesting to redact portions of its Motion relating to Ms. Smith's medical records and to seal the corresponding exhibit containing her medical records. *See* ECF No. 38. Fennemore did not publicly file these documents.

Ms. Smith vaguely references a "cross motion to seal medical records, issue permanent injunctive relief, and issue a permanent protective order." ECF No. 40 at 12:12-13. To the extent Ms. Smith seeks to have her medical records filed under seal (which records were already preemptively filed under seal pending resolution of Fennemore's Motion to Seal), Ms. Smith's

---

[26] *See* ECF Nos. 19 (Fennemore's Motion), 26 (Ms. Smith's Response), and 34 (Fennemore's Reply).
[27] *See* ECF No. 20, at 5.
[28] ECF No. 40, at 1:26:27.
[29] ECF No. 38, at 3:5-7.

-11-

4838-4681-4370

1  "cross motion" should be construed as a non-opposition to Fennemore's Motion to Seal. However,
2  to the extent Ms. Smith requests permanent injunctive relief and a permanent protective order
3  "excluding Ms. Smith's medical records from all proceedings," the Court should deny Ms. Smith's
4  request.

5  Ms. Smith's request for injunctive relief is improper and unsupported by law. Ms. Pierce
6  does not yet know how or if the medical records will be used in depositions, subsequent briefs, or
7  trial, and Ms. Smith has provided no authority, legal or otherwise, that would support excluding
8  these records at this juncture. Ms. Smith's medical records are directly relevant to the Peruzar
9  Litigation and the steps Fennemore and the Fennemore Employees took in response to Ms. Smith's
10 threats, which is Ms. Smith's purported basis for this action.

### III. CONCLUSION

For the foregoing reasons, Fennemore and the Fennemore Employees respectively request that the Court quash Ms. Smith's Subpoenas or, in the alternative, enter a protective order prohibiting discovery pursuant to the Subpoenas. If the Court is not inclined to quash or withdraw the Subpoenas, the Fennemore Employees request that the Court enter a protective order setting the guidelines for depositions and forbidding the disclosure of matters beyond the scope of discovery.

Dated: August 28, 2019.             SNELL & WILMER L.L.P.

By: /s/ Michael Paretti
Alex L. Fugazzi, Esq. (NV Bar No. 9022)
Michael Paretti (NV Bar No. 13926)
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
*Attorneys for Defendant Fennemore Craig*

-12-

4838-4681-4370

## CERTIFICATE OF SERVICE

I, the undersigned, declare under penalty of perjury, that I am over the age of eighteen (18) years, and I am not a party to, nor interested in, this action. On this date, I caused to be served a true and correct copy of the foregoing **FENNEMORE CRAIG AND THE NONPARTY FENNEMORE EMPLOYEES' REPLY IN SUPPORT OF THEIR EMERGENCY MOTION TO QUASH, OR IN THE ALTERNATIVE, MOTION FOR A PROTECTIVE ORDER** by method indicated below:

☐ **BY FAX:** by transmitting via facsimile the document(s) listed above to the fax number(s) set forth below on this date before 5:00 p.m. pursuant to EDCR Rule 7.26(a). A printed transmission record is attached to the file copy of this document(s).

☒ **BY U.S. MAIL:** by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Las Vegas, Nevada addressed as set forth below.

> Latonia Smith (*in Pro Per*)
> 9748 Canyon Landing Ave.
> Las Vegas, NV 89166
> Tel: (725) 203-2455 or (702) 521-3522

☐ **BY OVERNIGHT MAIL:** by causing document(s) to be picked up by an overnight delivery service company for delivery to the addressee(s) on the next business day.

☐ **BY PERSONAL DELIVERY:** by causing personal delivery by, a messenger service with which this firm maintains an account, of the document(s) listed above to the person(s) at the address(es) set forth below.

☐ **BY ELECTRONIC SUBMISSION:** submitted to the above-entitled Court for electronic filing and service upon the Court's Service List for the above-referenced case.

☐ **BY EMAIL:** by emailing a PDF of the document listed above to the email addresses of the individual(s) listed below.

DATED this 28th day of August, 2019.

_____
An employee of SNELL & WILMER L.L.P.

4838-4681-4370

## INDEX OF EXHIBITS

| Exhibit No. | Description | No. of Pages |
|---|---|---|
| G | Declaration of Shannon Pierce | 2 |
| H | April 17, 2019 Audio Recording of Ms. Smith (manually filed) | N/A |
| I | Transcript of April 17, 2019 altercation | 1 |
| J | April 17, 2019 Video Footage (manually filed) | N/A |
| K | April 22, 2019, Declaration of Latonia Smith | 4 |
| L | Various social media posts and messages to Samantha Radak | 25 |
| M | April 16, 2019 Affidavit of Latonia Smith | 2 |
| N | Excerpts from August 2, 2019 Deposition Transcript of Brandon Trout | 9 |

- 14 -

4838-4681-4370