

1   LATONIA SMITH
    9748 CANYON LANDING AVE.
2   LAS VEGAS, NV 89166
    725-203-2455
3   PLAINTIFF IN PROPER PERSON

4                    UNITED STATES DISTRICT COURT

5                         DISTRICT OF NEVADA

6

7   LATONIA SMITH,

8                    Plaintiff(s),

                                        CASE NO. 2:19-cv-00824-GMN-EJY
9            -vs-

10  FENNEMORE CRAIG,

11                   Defendant(s).

12

13  **OPPOSITION TO SAMANTHA RADAK'S AND DEBORAH GIANINI'S MOTION TO**
                              **QUASH SUBPOENAS**
14

15       Plaintiff Latonia Smith files her opposition to Samantha Radak's and Debora

16  Gianini's Motion to Quash Subpoenas dated August 1, 2019. Counsel for deponents

17  cite that the subpoenas were legally improper, violate a settlement agreement, request

18  information protected by attorney-client/work product privilege, and cause undue

19  burdens on deponents. The overarching theme is that deponent's counsel is attempting

20  to prevent Plaintiff from conducting discovery e.g. wants the Court to issue an order

21  preventing deponents from having a deposition taken and producing evidence related to

22  the case. Each of counsel's arguments fail and will be addressed herein. The Court

23  should deny defense counsel's attempts to subvert the discovery process. This

24  opposition is based on the papers and pleadings on file herein and their respective

25  exhibits, especially Plaintiff's Motion to Compel Samantha Radak and Deborah Gianini

26  to attend deposition, and any other oral/written argument that may be heard concerning

27  the matters.

28

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    FACTUAL BACKGROUND

As explained in Plaintiff's Opposition to defendant Fennemore Craig and CEC/PHWLV/SHANNON PIERCE/ETHAN THOMAS' (separate case) request to consolidate cases, this instant action against Fennemore Craig and the action against CEC/PHWLV/SHANNON PIERCE/ETHAN THOMAS are distinct in legal facts (and venue), and thus the discovery that will be sought in the cases will be distinct. While defense counsel attempts to make an argument for consolidation by using a cloaked excuse that it will ease burdens and save judicial resources, the fact of the matter is that consolidation will do just the opposite. In fact, the realities of consolidation are briefly addressed herein in opposition to defense counsel's second point (8:1).

Although defense counsel would like to insert Ms. Smith into Mrs. Peruzar's current case, in the Eighth Judicial District Court, the fact is that Mrs. Peruzar's lawsuit did not and does not concern Ms. Smith (see **Exhibit 1**).

The inextricable linkage between Mrs. Peruzar and Ms. Smith (concerning background facts of the case) comes as a result of defendants themselves, who used the Plaintiff as another pawn in their attempts to fire Mrs. Peruzar and prevent her from being reinstated. Testimony from third party, Teri Pringle, proves as much, and is also one of the backdrops for the crime-fraud exception (**Exhibit 2**).

### TARGETING OF MS. SMITH

In 2017, defendants engaged in a conspiracy to fire Mrs. Peruzar after they falsified documents and began slandering/defaming Mrs. Peruzar in order to frame Mrs. Peruzar for a theft that was committed by another employee whom they wanted to protect. Since then it has been overwhelmingly revealed that Mrs. Peruzar was in fact framed, even with the victim in question in the case signing an affidavit and making statements that the event occurred on a day in which Mrs. Peruzar was on a different

floor. Since the story of PHWLV and CEC seemed unlikely and they were not assured that Mrs. Peruzar would be fired, CEC/PHWLV along with their cohorts began creating messages and asserting that these messages came from Ms. Smith, who they (and their cohorts) had researched before-hand. After terminating Mrs. Peruzar, CEC/PHWLV along with their cohorts continued these defamatory accusations causing Ms. Smith to be hospitalized. One of the first third parties they contacted, spreading these defamatory accusations, was the third-party witness Teri Pringle (part of testimony has been submitted) even going so far as to call her on Christmas day to tell her that Plaintiff's *name* were on alleged threats (this was also false); this witness has never met Ms. Smith, nor did she know Ms. Smith. CEC/PHWLV and their cohorts continued their defamatory accusations even after being warned to cease their actions. Ms. Smith also reached out to the CEO to quell the issues, without realizing at the time that this was all a part of a larger, nefarious plan. Several months later (and because Mrs. Peruzar was still in a position to be re-employed) CEC/PHWLV and their cohorts randomly began filing protective orders against Ms. Smith and added Ms. Smith to a random lawsuit containing 50 DOE parties as retaliation. The matters were disposed by admission of CEC/PHWLV themselves that they had no evidence pointing to Ms. Smith. In fact, all they used in their attempts to target Ms. Smith were the fabricated messages that they continually insert into every matter and which is at subject after they were created by CEC/PHWLV, Fennemore Craig, and their associates. Third party witnesses, who have remained anonymous due to the fear of retaliation, have also implicated CEC/PHWLV and Fennemore Craig, and their cohorts in these unlawful goals (please see Exhibits in Plaintiff's Opposition to defendant Fennemore Craig's motion to dismiss).

  Mrs. Peruzar filed a lawsuit against CEC/PHWLV in November of 2018 based on the matters concerning their falsification of evidence concerning a guest complaint in

order to frame and terminate her and gross defamation (non-exhaustive herein).

Namely, a wrongful termination suit. It is evident that Mrs. Peruzar went out of her way

to preclude Ms. Smith from all matters, but when Mrs. Peruzar filed the lawsuit,

CEC/PHWLV and their cohorts continued their hateful and malicious targeting of Ms.

Smith, seeking to resurrect their failed 2017 plot. Thus, in fact it is all defendant parties

and their cohorts who sought and continually seek to improperly retaliate by targeting

Ms. Smith; it is all defendant parties who have went out of their way to seek the

destruction of Ms. Smith.

Plaintiff addresses defense counsel's newfound argument about being unable to

participate by creating a conflict of interest himself, below.

## II.    ADDRESSING FACTS OF THE INSTANT MOTION

Both deponents were directly involved in (non-exhaustively) defaming Ms. Smith

and using the judicial system to further a fraud against Ms. Smith with the background

facts, above, being the backdrop. Since discovery is tailored to the case and facts

concerning Fennemore Craig, both deponents are witnesses in this instant case.

Plaintiff incorporates her Motion to Compel concerning the meet and confer held

with Mr. Riley Clayton. Simply put, Mr. Clayton had no idea what was going on, but still

chose to assert a myriad of blanket objections, which Plaintiff would not bow to. Mr.

Clayton's argument concerning Samantha Radak lacked for several reasons, including

the fact that the agreement expressly allows certain portions of it to become inactive

concerning legal matters or any conflicts thereof. Mr. Clayton acknowledged the

argument and moved on. Ms. Smith was correct in asserting that there was no stay of

discovery in the instant lawsuit and that deponents would be questioned concerning the

matters at issue in the Fennemore Craig lawsuit. Mr. Clayton noted that he did know

that discovery was ordered in the Fennemore Craig case (again, he did not know what

was going on, but blindly asserted objections to a subpoena). Plaintiff sees no ground

on which defense counsel can stand in asserting that witnesses should not be deposed, nor produce evidence.

## III.    OPPOSITION TO LEGAL ARGUMENTS

### THIS COURT SHOULD ISSUE AN ORDER REQUIRING SAMANTHA RADAK AND DEBORAH GIANINI TO ATTEND DEPOSITION AND PRODUCE DOCUMENTS

A party has a general right to compel any person to appear at a deposition, through issuance of a subpoena if necessary. **FED. R. Civ. P. 30(a).** While the deponent's have the right to object, Plaintiff contends that the objections are frivolous and fail to provide adequate excuses preventing the deponents from attending deposition or producing documents. First, the provisions of the agreement concerning Ms. Radak are severable under #13 and #10, and, specifically, when such provisions of the agreement is not in accordance with the laws of the State of Nevada and/or conflicts with such laws/legal proceedings. Specifically, herein and concerning the instant lawsuit, State Laws required that Ms. Radak attend deposition as the subpoenas were issued via Court Order. Defense counsel agreed to as much, during the meet and confer, when he decided that he could not present further argument concerning those facts. In addition, concerning counsel's footnote of a preemptive strike, none exists, and his argument fails. The opposing parties continue to violate the terms of the agreement as it never allowed for their express distribution of such agreement simply because they "want to seek a protective order" (which Plaintiff contends is also frivolous). The agreement is clear and expressly also protects Plaintiff by instituting multiple layers before any such distribution of the agreement. Plaintiff reserves all rights. Nevertheless, deponent's arguments concerning not being subject to deposition via a Court Order, which included the served Subpoena to Ms. Radak, fails.

//

**Deponent's Arguments Concerning A Stay of Discovery, Motions to Dismiss, and Motions to Consolidate Fail**

Defense Counsel first makes an argument concerning consolidation of the CEC/PHWLV/SHANNON PIERCE/ETHAN THOMAS case with this instant lawsuit, the realities of which should be briefly addressed herein. The reality of consolidation (even if it is initially designated "pretrial") is that it is never unscrambled because there is a global settlement, because the consolidated cases are resolved by pretrial motion, or because the cases are later formally consolidated for trial (see Steinman, supra note 2, *The Effects of Case Consolidation on the Procedural Rights of Litigants*). In addition to citing that the cases were distinct, in her Opposition to Consolidation, Plaintiff also asserted that consolidation of the cases, also concerning separate corporate entities, will only cause confusion (not alleviate confusion), unfair treatment (Plaintiff's claims against individual parties and corporations will be lost), and expand (not conserve) judicial resources. Defense counsel's motive is to gain an unfair advantage over Plaintiff in consolidating cases simply for the purpose of being able to oppose discovery in one fell swoop. Counsel has already admitted that their only goal is to file motions simply to limit Plaintiff's discovery of facts relevant to both litigations under a blanket assertion of attorney client privilege and preclude the testimony of witnesses (8:25-27); they cite that the inability to do this all at once is an "undue burden." Seeking to stop the deposition of relevant witnesses and exclude testimony is not an "undue burden" that is recognized in any Court of law but is an attempt by all opponents to subvert the discovery process and prevent the Plaintiff from pursuing claims. Counsel for both parties in the separate cases only seek to combine the cases in order to prejudice Plaintiff in the lawsuits against the separate parties, including but not limited to preventing Plaintiff from gathering facts specific to the cases.

Discovery was ordered in the case via the Court despite some of the pending motions because the Court saw fit that discovery should go proceed (most likely due to defendant's many many factual contentions). So, essentially, Defense counsel only argues that the undue burden posed on deponents is hypothetical, in that the deponent's may be deposed in two separate actions. No determinations have been made concerning depositions in the separate case, but the depositions in this instant case are concerning the matters specific to defendant Fennemore Craig and the deponents' level of involvement with Fennemore Craig, not CEC/PHWLV/SHANNON PIERCE/ETHAN THOMAS, which would (if those depositions are even sought in that case) produce a different line of questioning for any witnesses called to attend deposition. Deponent's recitation of a "hypothetical" undue burden should be rejected. Even if the Court could predict that both deponents would be deposed twice, the fact remains that the two cases are separate and distinct, thus any depositions sought in the Fennemore Craig case will include separate fact gathering from that of the CEC/PHWLV/SHANNON PIERCE/ETHAN THOMAS case.

Deponent's then cite that due to the cases being separate in nature, the Plaintiff will have an unfair advantage because counsel in the separate case against CEC/PHWLV/SHANNON PIERCE/ETHAN THOMAS cannot be present at Samantha Radak's and Deborah Gianini's deposition. Counsel began the legal brief by stating that Samantha Radak and Deborah Gianini chose to retain the same attorneys as in the separate CEC/PHWLV/SHANNON PIERCE/ETHAN THOMAS case, and that he agreed to the retainer despite *knowing* of the conflict of interest (3:23-28). As such, defense counsel's attempts to now assert this as an argument of undue burden/disadvantage (which is equally perplexing) should be rejected.

//

//

**Deponents Had Reasonable Time To Prepare For Deposition**

The Deponents had enough time to prepare for deposition under the requirements of the Federal Rules of Civil Procedure. Ms. Radak was served on August 12, 2019 and Ms. Gianini was served on August 13, 2019 as confirmed by defense (affidavits already on file with the Court). All parties were also noticed before service of the subpoenas on August 1, 2019. As such, defense's argument that the Plaintiff did not provide enough time for deposition is erroneous and makes it more evident that defense only seeks to prevent Plaintiff from conducting discovery. **Fed. R. Civ. P. 30(b)(1)** requires that "a party who wants to depose a person...must give reasonable written notice." More than one week's notice generally is considered reasonable. See, e.g., ***Paige v. Commissioner***, 248 F.R.D. 272, 275 (C.D. Cal. Jan. 18, 2008) (finding that fourteen days' notice was reasonable); ***Jones v. United States***, 720 F. Supp. 355, 366 (S.D.N.Y. 1989) (holding that eight days' notice was reasonable); see also ***In re Sulfuric Acid Antitrust Litig.***, 231 F.R.D. 320, 327 (N.D. Ill.2005) ("[T]en business days' notice [of a deposition] would seem to be reasonable").

**THIS COURT SHOULD ISSUE AN ORDER REQUIRING SAMANTHA RADAK AND DEBORAH GIANINI TO PRODUCE DOCUMENTS**

As stated in Plaintiff's Motion to Compel, defense counsel admit in his own motion that during the meet and confer he was initially seeking more time to produce the documents requested, but then stated that he would still be filing a motion to quash. Thus, no agreements were made due to defense counsel's own perplexing arguments. See deponent's motion to quash 5:8-10 ("time would be needed for.... Deponents to retrieve any requested documents, review them for purposes of privilege, and prepare the applicable privilege log). Since deponent's have admitted that they did, in fact, initially agree to produce the documents, the Court should issue an order requiring the deponents to produce the required documents.

**Deponents Advanced A Perplexing Argument During The Meet and Confer Which Led To No Agreements Being Made About Document Production And Now Asserts Undue Burden**

Again, during the meet and confer, when defense counsel cited that he would need more time to produce documents, Plaintiff asked defense multiple times to confirm that if Plaintiff agreed to an extension of time to produce documents, documents would be produced. Defense would not confirm citing that he wanted to file a motion to quash the subpoenas. Plaintiff simply cited that she would not allow defense to play both sides of the fence. Namely, defense wanted Plaintiff to agree to an extension to produce documents while still being allowed to file a motion to quash production of said documents. Now, defense inserts an argument citing that the subpoenas were burdensome, and Plaintiff would not allow time to produce the documents. The Plaintiff never disagreed to providing counsel more time to produce the requested documents, as explained above, and defense's motion even admit that he initially sought more time to produce documents (even while having this instant motion to quash on the docket). Simply, defense's argument is blatantly false and should be rejected.

Incorporating Plaintiff's motion to compel, deponents have not met the heavy burden of proof to quash the subpoena concerning the document production.

**THERE IS NO ATTORNEY-CLIENT/WORK PRODUCT PRIVILEGE TO BE ASSERTED AND RELEVANCE/PROPORTIONALITY HAS ALREADY BEEN ESTABLISHED**

Plaintiff reasserts the arguments from her Motion to Compel Samantha Radak and Deborah Gianini to attend deposition and produce documents. Plaintiff asserted her arguments to Mr. Clayton concerning the crime-fraud exception, so his newfound assertions that Plaintiff did not assert the arguments now contained in the Plaintiff's Motion to Compel, are false. Plaintiff's assertion of the crime-fraud exception should be

kept at the forefront of any decision regarding the instant lawsuit. Defense does not make an opposing argument to Plaintiff's crime-fraud exception in the instant motion. Plaintiff contends that it is because no opposing argument can be made. Deponent's have already been implicated in intending to commit and further a crime/fraudulent act by use of the judicial system.

Although plaintiff contends that there is no privilege due to the crime-fraud exception, even if defense's arguments were considered, conclusory assertions of a privilege is insufficient to establish that the information is privileged. See *Holifield v. United States*, 909 F.2d 201, 203-04 (7th Cir. 1990). Defense counsel is asserting a privilege over documents that, by his own admission, he does not know about, nor has he reviewed. In fact, during the meet and confer defense asserted that he was "out of the loop." On that basis alone, defense's argument should be rejected, but Plaintiff digresses. Defense counsel's attorney-client privilege is supported only by brief conclusory summations as to why documents are protected, and he does little to address the applicability of the privilege with respect to individual documents nor does he set forth "specific facts" to support his legal conclusions. The Seventh Circuit found in *Holifield v. U.S.* that this type of "blanket objection" does not suffice to support a claim that the attorney-client privilege prohibits the production of documents. See also *First State Bank*, 691 F.2d at 335; see also *United States v. Lawless,* 709 F.2d 485, 487 (7th Cir. 1983) (a claim of privilege must be made on a document-by-document basis; a blanket claim of privilege is unacceptable).

Rule 26 of the Federal Rules of Civil Procedure outlines the scope of allowable discovery. Case law applying Rule 26 emphasizes that "relevancy under Rule 26 is extremely broad," *U.S. E.E.O.C. v. Caesars Enter., Inc.,* 237 F.R.D. 428, 431 (D. Nev. 2006), and "contemplates discovery into any matter that bears on or that reasonably could lead to other matter that could bear on any issue that is or may be raised in a

case," *Phoenix Solutions Inc. v. Wells Fargo Bank*, N.A., **254 F.R.D. 568, 575 (N.D. Cal. 2008)** (emphasis added). "Relevant information for purposes of discovery is information 'reasonably calculated to lead to the discovery of admissible evidence.'" *Surfvivor Media, Inc v. Survivor Prods.*, **406 F.3d 625, 635 (9th Cir. 2005)** (quoting *Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1470 (9th Cir. 1992)). See also Kerr v. U.S. Dist. Court for the N. Dist. Of Cal., 511 F.2d 192, 196 (9th Cir. 1975) ("the question of relevancy is to be more loosely construed at the discovery stage than at the trial" and "it is no ground for objection that the information sought in pretrial discovery would not be admissible at trial"). Defense cannot make a cognizable argument concerning Samantha Radak's and Deborah Gianini's relevance to the instant lawsuit.

As stated herein, in Plaintiff's background facts, the information sought is proportional to the needs of the case and are not overbroad. In fact, if the requests are any more tailored, they would exclude relevant evidence, and, ultimately, prejudice the Plaintiff by excluding evidence concerning why and how Plaintiff incurred damages related to the claims. In reality, defense seeks to exclude any evidence concerning Mrs. Peruzar when it was opponents' very own actions that inextricably linked Plaintiff to Mrs. Peruzar termination, due to their need to seek retaliation. Thus, any argument by defense citing that Plaintiff is only attempting to re-hash Mrs. Peruzar's termination is clearly ignorant of the facts (which defense admitted he was at the meet and confer). Opponents saw fit to use and defame Ms. Smith in connection with Mrs. Peruzar's termination (and attempted reinstatement), and thus any discovery related to the matters in the Fennemore Craig lawsuit, including the relationships of those involved, is proportional.

Incorporating Plaintiff's motion to compel, deponents have not met the heavy burden of proof to quash the subpoenas issued.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff requests that this Court deny deponent's motion to quash.

Dated this 10th day of September 2019

/s/ Latonia Smith
LATONIA SMITH
9748 CANYON LANDING
AVE.
LAS VEGAS, NV 89166

# EXHIBIT 1
# PERUZAR LAWSUIT

Electronically Filed
11/5/2018 6:32 PM
Steven D. Grierson
CLERK OF THE COURT

1  **COMJD**

2  ANNECER PERUZAR
   9748 CANYON LANDING AVENUE
3  LAS VEGAS, NV 89166
   702-809-0988
4  SHAYTONI9495@YAHOO.COM
   Plaintiff, in Proper Person

5

6

7                    **DISTRICT COURT**
                **CLARK COUNTY, NEVADA**
8
   ANNECER PERUZAR,                          A-18-784032-C
9
                Plaintiff,                   Case No. Department 4
10                                           Dept. No.

11       -vs-

12 CAESARS ENTERTAINMENT CORPORATION,
   a Delaware corporation; PHWLV, LLC d/b/a PLANET
13 HOLLYWOOD RESORT AND CASINO, a Nevada
   limited liability company
14

15                Defendants.

16
                **COMPLAINT AND JURY DEMAND**
17

18                     **Arbitration Exempt**
             **(Amount in Controversy Exceeds $100,000)**
19

20       COME NOW Plaintiff Annecer Peruzar, an individual ("Mrs. Peruzar") (referred to

21 herein as "Plaintiff") hereby complain and allege against Defendants as follows:

22                          **PARTIES**

23   1.  At all relevant times Mrs. Peruzar was and is a resident of Clark County,

24       Nevada

                              1

2. At all relevant times Caesars was and is a Delaware corporation authorized to do business in Nevada.

3. At all relevant times Planet Hollywood was and is a Nevada limited liability company authorized to do business in Nevada. Planet Hollywood is an affiliated entity with Caesars.

4. This Court has jurisdiction over the parties and venue is proper in this Judicial District under NRS 3.040.

## FACTS

### A. Background

5. Plaintiff was employed at Caesars Entertainment-Planet Hollywood from November 19, 2012 until November 15, 2017. At the time of Plaintiff's termination, Plaintiff was employed as a Guest Room Attendant (GRA). Petitioner was terminated on November 15, 2017, for alleged theft, which was considered gross willful misconduct.

6. Plaintiff was asked by a stayover guest, in room 715, to clean room despite a do not disturb sign. Plaintiff agreed to clean the room. Plaintiff received and took a tip of $1.18 on October 31, 2017. The tip was left on the dresser, as change (4 quarters, 3 nickels, and 3 pennies).

7. On November 1, 2017, a floor manager at Caesars Entertainment-Planet Hollywood approached Plaintiff, around 2:00 pm, about a complaint submitted by room 715 around noon on November 1, 2017. The floor manager first asked if the Plaintiff had cleaned room 715 on the morning of November 1, 2017. The Plaintiff responded, indicating that she neither cleaned that room.

1   nor was she stationed there on the morning of November 1, 2017. The floor

2   manager then specified that on November 1, 2017, around noon, room 715

3   complained that $2.00 (in the form of bills) was missing off of the nightstand.

4   The Plaintiff, again, informed the floor manager that she neither entered or

5   was stationed at room 715 on the morning of November 1, 2017. The Plaintiff

6   informed the floor manager of the tip received the day prior from the same

7   room, but noted that the details of the relayed complaint did not concern her.

8   The floor manager acknowledged that another GRA was stationed at room

9   715 on the morning of November 1, 2017 (not the Plaintiff). The floor

10  manager vowed to seek out more information about the guest complaint,

11  however, this did not happen. Although, the guest was compensated to stay

12  until November, 2, 2017, no contact with the guest was made. On November

13  5, 2017, after 4 days of work (1 in which the guest was still present and no

14  contact with the Plaintiff or guest had been made), the Plaintiff was

15  suspended immediately pending an investigation. On November 15, 2017,

16  without any details from an investigation (and later revealed without an

17  investigation), the Plaintiff was terminated. The Plaintiff did not have any other

18  disciplinary actions on file.

### FIRST CAUSE OF ACTION

**INTENTIONAL TORT (FRAUD/MISREPRESENTATION/MALICE)**

8.  Plaintiff hereby incorporate each and every preceding paragraph in this

    Complaint as if set forth fully herein.

9.  In Unemployment and Culinary documents, it was revealed that Caesars Entertainment Corporation and PHWLV engaged in making false statements, and in falsifying and submitting falsified documents in order to frame the Plaintiff for the crime of theft, which led to the Plaintiff's termination (under gross willful misconduct), subsequent denial of unemployment benefits, and an ongoing Culinary Union dispute (Caesars Entertainment Corporation and PHWLV refuses to reinstate Plaintiff's job, offer backpay, and/or a payout).

10. In order to justify the Plaintiff's termination and frame the Plaintiff for theft, Caesars Entertainment Corporation and PHWLV re-entered their system several times, the last time being January 10, 2018, at 2:26pm and 2:27pm, to make changes to the alleged initial complaint that was shown to be entered at 6:05 pm (not at noon) on November 1, 2017. January 10th is significant because this is the time in which Caesars Entertainment Corporation and PHWLV were presenting documents to the Culinary Union. In the documents submitted to Unemployment and Culinary, the actual screenshot of the complaint window is time stamped and the change is highlighted to match the Plaintiff's response to the floor manager on November 1, 2017; it was altered to say, "gst upset about missing change on dresser." The screenshot submitted by Caesars Entertainment Corporation and PHWLV further indicates that they can go back in to "change/delete/forward/finish/print" anything inputted into the system. In Unemployment and Culinary documents/testimony, Caesars Entertainment Corporation and PHWLV testified that the original, alleged guest complaint inputted by an unknown

front desk agent was $2.00 missing from the guest's nightstand, on November 1, 2017. Caesars Entertainment Corporation and PHWLV also testified that they never spoke to or got a written statement from the guest, and that they had no way of getting in contact with the guest at all in order to verify his complaint which did not concern the Plaintiff; this was false. Caesars Entertainment Corporation and PHWLV removed 1 night from the guest's bill and comped the guest an extra night; they also had the guest's contact information and had plenty of opportunity to contact the guest, but chose not to as this would undermine their fraudulent activity and their goal to fire the Plaintiff. Caesars Entertainment Corporation and PHWLV testified that the complaint was, instead, entered by the unknown front desk agent, and that the altered complaint was all they had in order to terminate the Plaintiff.

11. In Unemployment documents and Culinary hearings, Caesars Entertainment Corporation and PHWLV said they conducted an investigation. However, this is not true. Instead, they testified that they did a floor walk, where they walked up to the guest's room, saw a do not disturb sign, and concluded that no one else could have gone into the guest's room except the Plaintiff. Caesars Entertainment Corporation and PHWLV, purposefully, omitted that any GRA has access to all rooms on their station, and ignored the fact that another GRA (not the Plaintiff) was stationed at the room on the day and time of the guest's complaint. Caesars Entertainment Corporation and PHWLV did not question the GRA stationed at the room on November 1, 2017, they did not question the guest, nor did they question the front desk agent (as they

1   testified that s/he was unknown). They simply committed fraud,

2   misrepresented evidence, and acted with malice in their intent to frame and

3   accuse the Plaintiff of theft, and any further documents submitted by them

4   which can be altered should be looked upon with suspicion.

5   12. In further fraud, malice, and misrepresentation, Caesars Entertainment

6   Corporation and PHWLV submitted portions of an outdated 2012 GRA

7   handbook, under the guise of the new 2015 handbook, which the Plaintiff

8   signed for, in order to justify their erroneous position that the Plaintiff engaged

9   in theft and violated company policies. Caesars Entertainment Corporation

10   and PHWLV further testified that the Plaintiff was lying about the lack of a tip

11   policy/tip envelopes, and that there were tip policies, as well as tip envelopes

12   in place at the time of the Plaintiff's employment. In fact, Caesars

13   Entertainment Corporation and PHWLV's 2015 GRA handbook has no

14   policies on removing tips from a stayover, nor policies on tip envelopes.

15   Caesars Entertainment Corporation and PHWLV had gotten rid of tip

16   envelopes for guests during the time of Plaintiff's employment (as reflected in

17   the changes from the 2012 to the 2015 handbook), and previous to the time

18   period of the alleged guest complaint. The 2015 handbook only has policies

19   regarding removing guests' belongings, in which a tip is not a part of. Under

20   federal and state law (NRS 608.160), a tip belongs to the employee. In

21   addition, current employees signed a petition and are still willing to testify that

22   Caesar's Entertainment Corporation and PHWLV did not have tip envelopes

23   at the time of the Plaintiff's employment, as they falsely testified to, with the

24

intent of misrepresenting information and damaging the Plaintiff's position in
seeking relief. Employees are also willing to testify that shortly after the
Plaintiff's termination, tip envelopes were reinstated, again, with the intention
of misrepresenting and deceiving the Plaintiff and other third parties. Caesars
Entertainment Corporation and PHWLV's falsified documents (constituting
fraud). Submittal of these falsified documents, false statements, and
purposeful misrepresentation of information, led to the Plaintiff's termination,
denial of unemployment benefits, and an ongoing dispute with Culinary Union
(Caesars Entertainment Corporation and PHWLV refuses to reinstate
Plaintiff's job, offer backpay, and/or a payout).

13. Caesars Entertainment Corporation and PHWLV, in their zeal to fire the
Plaintiff, who is one of few African Americans in the department, and who
testified that she was previously subject to hateful, racial remarks by the floor
manager and manager, committed fraud by making a false
representation/misrepresentation as to a past or existing fact—the altering and
submittal of the initial, alleged guest complaint which was not related to the
Plaintiff and misrepresentation of current policies and the current handbook,
at the time of the Plaintiff's employment. Caesars Entertainment Corporation
and PHWLV intended to induce the Plaintiff to act in reliance on the
representation and caused damages to the Plaintiff as a result of relying on
misrepresentation. The documents and false statements were used to
undermine the Plaintiff's positions. Caesars Entertainment Corporation and

PHWLV acted with malice in an attempt to cause unnecessary damage to the Plaintiff and her family.

14. Defendants Caesars Entertainment Corporation and PHWLV have been guilty of intentional tort, consisting of fraud, misrepresentation, and malice, and Mrs. Peruzar is entitled to punitive or exemplary damages, as set forth herein.

15. As a proximate result of the Defendants' outrageous and extreme conduct, Mrs. Peruzar has suffered damages in excess of $15,000, the exact amount to be set forth at trial on this matter.

16. As a direct and proximate result of the Defendants' actions, Mrs. Peruzar is entitled to not only general and compensatory damages, but also punitive or exemplary damages pursuant to NRS 42.005 for the fraud, malice, misrepresentation, and reckless disregard for Mrs. Peruzar, all proximately caused by Caesars Entertainment Corporation and PHWLV.

17. Mrs. Peruzar is entitled to an award for her reasonable fees and costs.

## SECOND CAUSE OF ACTION

### EMPLOYER DEFAMATION

18. Plaintiff hereby incorporate each and every preceding paragraph in this Complaint as if set forth fully herein.

19. In Unemployment documents and the Culinary Union hearings, Caesars Entertainment Corporation and PHWLV testified that they never spoke to the guest. Caesars Entertainment Corporation and PHWLV testified that the alleged complaint was actually entered into their system by an unknown front

8

1    desk employee, and documents show that this was altered and compromised

2    in order to frame the Plaintiff.  As revealed in Unemployment and Culinary

3    documents, Caesars Entertainment Corporation and PHWLV did not conduct

4    an investigation. In Unemployment and Culinary documents/hearings

5    Caesars Entertainment Corporation and PHWLV accused the Plaintiff of lying,

6    theft, and a reckless disregard for company policy. The tip left to the Plaintiff

7    and taken by the Plaintiff on October 31, 2017 did not and does not constitute

8    any of these false and defamatory charges, and Caesars Entertainment

9    Corporation and PHWLV failed to prove otherwise before making these false

10   and defamatory statements.

11   20. Caesars Entertainment Corporation and PHWLV made false and defamatory

12       statements against the Plaintiff by accusing the Plaintiff of lying and the crime

13       of theft. They further acted with malice and complete disregard for the Plaintiff

14       and her family by committing fraud to frame the Plaintiff of theft (as described

15       in the first cause of action). Unprivileged publication of these false and

16       defamatory statements were published to third parties. The false and

17       defamatory statements led to the Plaintiff's termination, denial of

18       unemployment benefits, and an ongoing Culinary Union dispute (Caesars

19       Entertainment Corporation and PHWLV has prevented the Plaintiff from

20       reinstatement of her job, backpay, and/or a payout). The false and

21       defamatory statements also led to emotional distress as detailed in the third

22       cause of action.

23

24

21. Defendants Caesars Entertainment Corporation and PHWLV has been guilty of defamation and Mrs. Peruzar is entitled to punitive or exemplary damages, as set forth herein.

22. As a proximate result of Defendants' actions, Mrs. Peruzar has suffered damages in excess of $15,000, the exact amount to be proven at trial on this matter.

23. As a direct and proximate result of Defendant's actions, Mrs. Peruzar is entitled to not only general and compensatory damages, but also punitive or exemplary damages pursuant to NRS 42.005 for the defamation and reckless disregard for Mrs. Peruzar's character/reputation and pursuit of relief, all proximately caused by Caesars Entertainment Corporation and PHWLV.

24. Mrs. Peruzar is entitled to an award of her reasonable fees and costs.

## THIRD CAUSE OF ACTION

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

25. Plaintiff hereby incorporates each and every preceding paragraph in this Complaint as if set forth fully herein.

26. The Defendants made false and defamatory statements about the Plaintiff.

27. The Defendants' conduct was extreme and outrageous with either the intention of, or reckless disregard for, causing emotional distress not only to the Plaintiff, but to her husband and two children (one of which was hospitalized due to this incident), as set forth herein.

28. As a proximate result of the Defendants' outrageous and extreme conduct, Mrs. Peruzar has suffered damages in excess of $15,000, the exact amount to be proven at trial on this matter.

29. As a direct and proximate results of Defendants' actions, Mrs. Peruzar is entitled to not only general and compensatory damages, but also punitive or exemplary damages pursuant to NRS 42.005 for the fraud or malice, express or implied, and wanton and reckless disregard for Mrs. Peruzar, all proximately caused by Caesars Entertainment Corporation and PHWLV.

30. Mrs. Peruzar is entitled to an award of her reasonable fees and costs.

## FOURTH CAUSE OF ACTION

### INJUNCTIVE RELIEF

1. Plaintiff hereby incorporates each and every preceding paragraph in this complaint as if set forth fully herein.

2. Wherefore, Plaintiff request that this Court grant the following relief:

    A. Judgment, for Plaintiff, for general and compensatory damages against Defendants in excess of $15,000, the exact amount to be determined at trial in this matter.

    B. An award of punitive or exemplary damages against Defendants for Plaintiff.

    C. An award of Plaintiff's reasonable fees and costs incurred in this matter.

    D. For interest at the statutory rate; and

1    E. For any other relief the Court deems just or necessary under the

2    circumstances.

3    ### **DEMAND FOR JURY TRIAL**

4    Pursuant to NRCP Rule 38, Plaintiff demands trial by jury in this action of all

5    issues so triable.

6    DATED this _ _5_ _ day of November, 2018

7

8    By:_____
     ANNECER PERUZAR
9    9748 CANYON LANDING AVE.
     LAS VEGAS, NV 89166
10   702-809-0988

11

12

13

14

15

16

17

18

19

20

21

22

23

24

# EXHIBIT 2
# TERI PRINGLE
# DEPOSITION
# TESTIMONY

1          MS. PIERCE:  Objection as to form.

2          A.  I don't know about that.

3     BY MS. PERUZAR:

4          Q.  Do you think it's possible that these letters

5     were being sent by Planet Hollywood or Caesars themself?

6          A.  I have no idea.  I never saw the letters.

7          MS. PIERCE:  Objection as to form.  Calls for

8     speculation and argumentative.  Lacks foundation.

9          MS. WEBER:  And just to keep a clean record,

10    please allow some time for counsel to make her objection

11    for the court reporter.

12         A.  I don't know anything about letters.  I never

13    saw them.

14    BY MS. PERUZAR:

15         Q.  So you said they had called you concerning the

16    letters or the e-mail.  Was it letters or e-mail?

17         A.  I think it was e-mail or Facebook.  I'm not

18    sure.

19         Q.  And they haven't sent you the e-mail or

20    letter?

21         A.  No.

22         MS. PIERCE:  Objection as to form.

23    BY MS. PERUZAR:

24         Q.  So can it be possible that those e-mails could

25    have been sent by an employee?

1      Q.   Has Ms. Peruzar at any time provided to the

2   Union any statements about her employment with Planet

3   Hollywood?

4      A.   What do you mean?

5      Q.   Anything in writing whatsoever?

6      A.   Just when she filed her grievance.

7      Q.   So we were looking at Exhibit 2 earlier, which

8   I believe is a one-sentence handwritten note from

9   Ms. Peruzar.

10          Is that what you're referring to?

11     A.   Yes.

12     Q.   Other than that, has Ms. Peruzar ever sent

13   anything to the Union in writing to discuss her

14   employment with Planet Hollywood?

15     A.   Not that I can recall.

16     Q.   What about Ms. Peruzar's daughter?  To your

17   knowledge, has the Union ever received any statements

18   from Ms. Peruzar's daughter?

19     A.   No.

20     Q.   Okay.  You mentioned earlier that sometimes

21   when a grievance comes in and it's about a suspension,

22   the Union will hold the grievance and then amend it

23   later to include a termination.

24          Do you remember that?

25     A.   Yes.

1   go, so she thought everything was okay.

2        Q.  Were you present when Ms. Peruzar was asked by

3   Araceli Chavez about the missing money?

4        A.  No.

5        Q.  So what you're testifying about is what

6   Ms. Peruzar told you later had happened?

7        A.  And the company.  They verified that she

8   did -- they called her.

9        Q.  So Planet Hollywood, as part of its

10  investigation, asked Ms. Peruzar about the missing money

11  and Ms. Peruzar said she thought it was a tip, and from

12  then on Planet Hollywood carried on its investigation;

13  is that right?

14       A.  Yes.

15            MS. WEBER:  Objection.  Form.

16            MS. PERUZAR:  What was the answer to that?

17  I'm sorry.

18       A.  Yes.

19  BY MS. PIERCE:

20       Q.  You said there was a point where somebody from

21  Caesars or Planet Hollywood talked to you about

22  Ms. Peruzar's daughter; is that right?

23       A.  They made comments.

24       Q.  Who from either of those companies made a

25  comment to you about Ms. Peruzar's daughter?

Teri Lynn Pringle                                    Annecer Peruzar v. Caesars Entertainment Corporation, et al.

1        A.   I think it started from Samantha and Yolanda.

2        Q.   Samantha was employed at Planet Hollywood; is

3    that right?

4        A.   Yes.

5        Q.   And when Ms. Mationg talked to you about

6    Ms. Smith, was it your understanding she was also

7    talking to you on behalf of Planet Hollywood?

8        A.   Can you repeat that?

9        Q.   Sure.

10       When Ms. Mationg was speaking to you about

11   Ms. Peruzar's daughter, was it your understanding that

12   Ms. Mationg was speaking to you on behalf of Planet

13   Hollywood?

14       A.   Yes.

15       Q.   What specifically did Ms. Radak say to you

16   about Ms. Peruzar's daughter?

17       A.   I remember her saying there was some Facebook

18   post or something from her daughter, and I asked for

19   those.   They said they will not give them to me because

20   it's not the reason she's being terminated.   And I then

21   told them then they cannot use it for a reason not to

22   bring her back and they can't use it in the arbitration.

23       Q.   So what Ms. Radak said to you was that there

24   were some Facebook posts from the daughter.   You then

25   asked for them, Planet Hollywood would not provide them,

1    and you said then, "You can't use them as a basis for

2    Ms. Peruzar's termination."

3         Have I accurately summarized the conversation?

4         A.   No.

5         Q.   Please tell me what happened.

6         A.   The company told me, "This is not the basis

7    for her termination," so it's not part of her grievance.

8    And I told them, "Then you can't use it as a basis for

9    not bringing her back and you can't use it in

10   arbitration."

11        Q.   Okay.  So I want to make sure I got it

12   correct.

13        The first thing that Ms. Radak said to you was

14   that there was a Facebook post from Ms. Peruzar's

15   daughter; is that right?

16        A.   Yes.

17        Q.   You then asked for a copy of the Facebook

18   post; is that right?

19        A.   Yes.

20        Q.   And Planet Hollywood said that it would not

21   provide the post because it wasn't the reason that

22   Ms. Peruzar's employment was terminated?

23        A.   Yes.

24        Q.   And at that point, you said then the company

25   cannot use the post as a basis for not bringing

1   Ms. Peruzar back and can't use it in arbitration; is

2   that right?

3        A.  Yes.

4        Q.  Is there anything else about the conversation

5   you had with Ms. Radak other than what we just talked

6   about?

7        A.  No.

8        Q.  Did Ms. Radak tell you what was said inside

9   the Facebook post?

10       A.  No.

11       Q.  You also said that Yolanda Mationg had a

12  conversation with you about Ms. Peruzar's daughter.  Is

13  it the same conversation we just discussed with

14  Ms. Radak or was it a separate conversation?

15       A.  We had a separate conversation.

16       Q.  And what did Ms. Mationg say to you in the

17  separate conversation in which she talked to you about

18  Ms. Peruzar's daughter?

19       A.  She called me Christmas morning and said I

20  need to do something, to talk to Annecer about her

21  daughter because she's still sending posts.

22       Q.  What did you say in response?

23       A.  I told her I cannot control her daughter, that

24  she would have to find another way.

25       Q.  Was there anything else that you discussed

1   with Ms. Mationg about Ms. Peruzar's daughter other than

2   what you've just told me?

3        A.  I don't think so.

4        Q.  Did Ms. Mationg tell you what was in the

5   subsequent posts that she was calling about?

6        A.  No, just threats of some sort.  I don't know.

7        Q.  Did Ms. Mationg use the word "threats"?

8        A.  Yes.

9        Q.  But you don't know what kind of threats they

10  were?

11       A.  No.

12       Q.  Do you know how it is that Planet Hollywood

13  came to believe that Ms. Peruzar's daughter was the one

14  sending the Facebook posts?

15       A.  No.  Her name was on it, I think.  I don't

16  know.  I really don't.

17       Q.  Other than those two conversations -- one with

18  Ms. Radak, one with Ms. Mationg -- has there been any

19  point where anyone from Planet Hollywood or Caesars

20  Corporation talked to you about Ms. Peruzar's daughter?

21       A.  No.

22       Q.  What was your reaction when you heard that

23  Ms. Peruzar's daughter had sent a threat?

24       A.  I don't know I had a reaction, other than

25  saying, "I need to see that."

1

CERTIFICATE OF SERVICE

2
I certify that I am serving a true and correct copy of the attached OPPOSITION

3
TO MOTION TO QUASH on the parties set forth below by:

4
_____ placing an original or true copy thereof in a sealed envelope with the

5
correct prepaid postage affixed for collection and mailing in the United

6
States Mail, at Las Vegas, Nevada.

7
___X___ Certified Mail, Return Receipt Requested of the document(s) listed above

8
to the person(s) at the address(es) set forth below

9
_____ E-service

10
_____ Personal delivery through a process server of the document(s) listed

11
above to the person(s) at the address(es) set forth below

12
Riley Clayton

13
HALL JAFFE & CLAYTON, LLP

14
7425 Peak Drive

15
Las Vegas, NV 89128

16
702-316-4111

17
rclayton@lawhjc.com

18
Alex Fugazzi and Michael Paretti

19
SNELL AND WILMER

20
3883 Howard Hughes Parkway Suite 1100

21
Las Vegas, NV 89169

22
702-784-5200

23
afugazzi@swlaw.com

24
mparetti@swlaw.com

25
___/s/ Latonia Smith___

26
Plaintiff, In Proper Person

27
Dated this 10th day of September 2019

28